**Sabria N. DUGHAISH, a minor by her Natural mother and next friend, Laura A. DUGHAISH and Laura A. Dughaish and Khalil I. Dughaish, Individually, Appellants–Plaintiffs,**

v.

**Donald COBB, M.D., Appellee–Defendant.**

No. 82A04–9906–CV–271.

Court of Appeals of Indiana.

May 15, 2000.

Rehearing Denied July 3, 2000.

160

H. Wayne Turpin, Glenn A. Deig, Evansville, Indiana, Attorneys for Appellants.

Julia Blackwell Gelinas, Susan E. Cline, Locke, Reynolds, LLP, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

ROBB, Judge

Sabria N. Dughaish, a minor by her mother and next friend Laura A. Dughaish, and Laura A. Dughaish and Khalil Dughaish, individually, (referred collectively as the "plaintiffs") appeal the trial court's denial of their Motion to Correct Errors pursuant to Indiana Trial Rules 50 and 59. We affirm.

### Issues

The plaintiffs raise the following consolidated and restated issues for our review:

1. Whether the trial court properly tendered modified Final Instruction No. 4 to the jury, an instruction which contained the traditional standard of causation in medical malpractice actions; and

2. Whether the trial court properly denied the plaintiffs' Motion to Correct Errors pursuant to Indiana Trial Rules 50 and 59.

### Facts and Procedural History

The facts most favorable to the judgment reveal that in 1971, Laura gave birth to her first child which weighed eight pounds fourteen ounces.[1] In 1986, Laura became pregnant for a second time with Sabria. Dr. Cobb was Laura's obstetrician and had been her gynecologist for a number of years prior to her becoming pregnant with Sabria. During the pregnancy, Dr. Cobb did not administer a glucose test to Laura in order to test her for gestational diabetes. However, Laura was tested for proteins and sugar via a urine dipstick upon every visit to Dr. Cobb's office. This test did not indicate that Laura had gestational diabetes.

On May 9, 1987, Laura was admitted to St. Mary's Hospital to give birth to Sabria. Laura was not in active labor when Dr. Cobb initially examined her at the hospital. Consequently, Dr. Cobb artificially ruptured Laura's membrane and started her on a Pitocin drip in an effort to expedite the labor process. When Laura was dilated enough to deliver Sabria, Dr. Cobb was paged to the delivery room. Upon arrival, Dr. Cobb noted that Sabria's head was visible during each of Laura's contractions. Because an additional dose of Pitocin did not cause the head to deliver, Dr. Cobb performed an episiotomy[2] and used forceps to deliver the head.

During delivery, Sabria suffered a shoulder dystocia.[3] Upon the shoulder being

---

1. Laura's first child was a macrosomic baby. Macrosomia is a medical term used to describe large infants. A baby that weighs over four thousand grams (eight pounds thirteen ounces) at birth is a macrosomic baby. R. 1170.

2. An episiotomy is defined as a "[m]edial or lateral incision of the vulva during childbirth to avoid undue laceration." DR. ALFONSO R. GENNARO ET AL., GOULD MEDICAL DICTIONARY 456 (1979).

3. A shoulder dystocia occurs when the infant's shoulder becomes lodged behind the

freed, Laura delivered Sabria. After delivery, Sabria's right arm was limp, her hands and feet were blue, and she needed oxygen. Moreover, Sabria weighed eleven pounds and thirteen ounces at birth, making her a macrosomic infant. As a result of incurring a shoulder dystocia, she suffered a brachial plexus palsy injury [4]-Erb's type,[5] bruises, abrasions, a fractured collarbone, and a cephalhematoma.

Thereafter, pursuant to the Medical Malpractice Act,[6] the plaintiffs filed a proposed complaint with the Indiana Department of Insurance. The Medical Review Panel issued its opinion on January 19, 1995, unanimously finding that:

> The evidence supports the conclusion that the defendant Donald Cobb, M.D., failed to comply with the appropriate standard of care as charged in the complaint. It is not possible to determine whether the conduct complained of was or was not a factor of the resultant damages.

R. 917. Consequently, the plaintiffs filed a complaint in the Vanderburgh Superior Court against Dr. Cobb, alleging medical malpractice. Following a jury trial, the jury returned a verdict in favor of the Dr. Cobb.

Thereafter, on February 16, 1999, the plaintiffs filed a Motion to Correct Errors and Memorandum in Support of Plaintiff's Motion to Correct Errors with the trial court, requesting relief under Indiana Trial Rules 50 and 59. On April 9, 1999, Dr. Cobb filed a Trial Rule 59(D) Statement in Opposition to Motion to Correct Errors and Response to Motion for Judgment on the Evidence. After holding a hearing on the motion, the trial court denied the plaintiffs' Motion to Correct Errors on June 9, 1999. This appeal ensued.

### Discussion and Decision

### I. Jury Instructions

The plaintiffs contend that the trial court erred when it tendered modified Final Instruction No. 4 to the jury which contained the traditional standard of causation in medical malpractice actions instead of their Proposed Final Instruction No. 10 which instructed the jury on the lower "increased risk of harm" standard. We disagree.

### A. Standard of Review for Jury Instructions

■■■ The giving of jury instructions is a duty entrusted to the discretion of the trial court, and its decision will not be disturbed unless there is an abuse of that discretion. *Morris v. K–Mart, Inc.,* 621 N.E.2d 1147, 1148 (Ind.Ct.App.1993), *trans. denied.* A party is generally entitled to have a tendered instruction read to the jury. *Id.* On review, we will reverse the trial court's refusal to give a tendered instruction when: 1) the instruction is a correct statement of law; 2) it is supported by the evidence; 3) it does not repeat material adequately covered by other instructions; and 4) the substantial rights of the tendering party would be prejudiced by the failure to give the instruction. *Underly v. Advance Mach. Co.,* 605 N.E.2d 1186, 1191 (Ind.Ct.App.1993), *trans. denied.*

### B. Traditional Standard of Causation

The plaintiffs argue that the trial court erred in refusing to tender their Final

---

symphysis, or pubic bone, resulting in the infant being unable to travel down the birth canal. One possible result of shoulder dystocia is injury to the brachial plexus, or nerve roots which supply the nerves to the shoulder. R. 1805.

**4.** Brachial birth palsy is defined as "[p]aralysis of the arm due to injury of the brachial plexus during birth." GENNARO, *supra* note 1, at 188.

**5.** An Erb's palsy is defined as "[u]pper brachial plexus paralysis." *Id.* at 460.

**6.** Indiana Code §§ 27–12–10–1 to –26 (1993). The Medical Malpractice Act has since been recodified at Indiana Code §§ 34–18–1–1 to –10–26.

Instruction No. 10 to the jury because they were entitled to a lower burden of proof with regard to causation, the "increased risk of harm" standard. Dr. Cobb argues that the plaintiffs are not entitled to a lower standard of causation because the plaintiffs do not fit within the class to which the "increased risk of harm" standard applies. In addition, Dr. Cobb argues that the traditional standard of causation applies to the plaintiffs' medical malpractice action, and therefore, the court's modified Final Instruction No. 4 was proper.

To establish a prima facie case of medical malpractice, a plaintiff must demonstrate: 1) the defendant's duty in relation to the plaintiff; 2) the defendant's failure to conform its conduct to the requisite standard of care required by the relationship forming the duty; and 3) an injury to the plaintiff resulting from that failure. *Bunch v. Tiwari, M.D.,* 711 N.E.2d 844, 850 (Ind.Ct.App.1999). In malpractice cases, health care providers must exercise that degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class acting under the same or similar circumstances. *Vergara v. Doan,* 593 N.E.2d 185, 187 (Ind.1992). To establish a prima facie case of medical malpractice, a plaintiff must provide expert testimony in order to show that the physician's performance fell below the applicable standard of care and that his negligence was the proximate cause of the plaintiff's injuries. *Etienne v. Caputi,* 679 N.E.2d 922, 924 (Ind.Ct.App.1997) (citing *Bethke v. Gammon,* 590 N.E.2d 573, 574–75 (Ind.Ct.App.1991)).

Generally, the traditional standard of proximate cause applies in medical malpractice actions in Indiana. *See Bunch,* 711 N.E.2d at 850; *see also Grzan v. Charter Hosp. of Northwest Indiana,* 702 N.E.2d 786, 790 (Ind.Ct.App.1998); *Etienne,* 679 N.E.2d at 924. To determine whether an act is the proximate cause of another's injury under the traditional standard of causation, we consider whether the injury was a natural and probable consequence of the negligent act, which, in the light of the attending circumstances, could have been reasonably foreseen or anticipated. *Goldsberry v. Grubbs,* 672 N.E.2d 475, 479 (Ind.Ct.App.1996), *trans. denied.* Thus, to be considered a proximate cause, the negligent act must have set in motion a chain of circumstances which in natural and continuous sequence lead to the resulting injury. *City of Portage v. Lindbloom,* 655 N.E.2d 84, 86 (Ind.Ct.App. 1995), *trans. denied.* The policy underlying proximate cause is that we, as a society, only assign legal responsibility to those actors whose acts are closely connected to the resulting injuries, such that imposition of liability is justified. *Adams Township of Hamilton County v. Sturdevant,* 570 N.E.2d 87, 90 (Ind.Ct.App.1991), *trans. denied.* Stated another way, proximate cause sets the parameters within which an actor "can expect the law to provide by way of protection to his activity." *Galbreath v. Engineering Constr. Corp.,* 149 Ind.App. 347, 356, 273 N.E.2d 121, 127 (1971).

In the present case, the trial court tendered a modified version of Dr. Cobb's Proposed Final Instruction No. 4 to the jury. The tendered instruction, as modified, provides in pertinent part that:

Plaintiffs have the burden of proving the following propositions by a preponderance of the evidence:

1) That Dr. Cobb's care and treatment of Laura Dughaish and Sabria Dughaish deviated from the applicable standard of care;

2) That the plaintiffs were damaged;

3) That Dr. Cobb's deviation proximately caused the damages to the plaintiffs.

As I have stated the plaintiffs must prove these propositions by a preponderance of the evidence; the defendant has no burden of disproving them.

R. 2229. Thus, the trial court's tendered instruction incorporates the traditional standard of causation in medical malpractice actions in Indiana.

### C. "Increased Risk of Harm" Standard of Causation

■ The plaintiffs argue that modified Final Instruction No. 4 was an incorrect statement of the law, and that the facts and the evidence submitted at trial required the trial court to tender their instruction regarding causation to the jury. The plaintiffs' Proposed Final Instruction No. 10, provides in pertinent part that:

If you find that the plaintiffs have proved by a preponderance of the evidence:

1. That Donald Cobb's care and treatment of Sabria N. Dughaish fell below the appropriate standard of care;

2. That plaintiff was damaged;

3. That Donald Cobb's failure to meet the appropriate standard of care increased the risk of harm to the plaintiff and was a substantial factor in causing the harm suffered by Sabria N. Dughaish;

Then you must find for the plaintiff.

If you find that the plaintiff has not proven these propositions by a preponderance of the evidence, then you should find in favor of the defendant.

R. 2224. The plaintiffs' proposed jury instruction essentially incorporates the Restatement (Second) of Torts section 323. The Restatement (Second) of Torts section 323 provides in pertinent part that:

Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services which he should recognize as necessary for the protection of other's persons or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increased the risk of such harm . . .

Section 323 provides a lesser burden of causation in tort actions than traditional proximate cause analysis and is often referred to as the "increased risk of harm" standard.

In 1995, the Indiana Supreme Court adopted the "increased risk of harm" standard as set forth in Section 323 as a method of determining causation in certain medical malpractice cases. *Mayhue v. Sparkman*, 653 N.E.2d 1384, 1388 (Ind. 1995). The Court in *Mayhue* was confronted with the issue of whether a health care provider was liable for the increased risk of harm caused to a patient, where the patient, as a result of injury or illness, already had a less than fifty percent (50%) chance of recovery, and the health care provider's negligence caused that patient to suffer an increased risk of injury or death. *Id.* at 1387. The Court noted that a traditional proximate cause analysis would result in the following conclusion:

Where a patient's illness or injury already results in a probability of dying greater than 50 percent, an obvious problem appears. No matter how negligent the doctor's performance, it can never be the proximate cause of the patient's death. Since the evidence establishes that it is more likely than not that the medical problem will kill the patient, the disease or injury would always be the cause-in-fact. The plaintiff must ordinarily prove that proper diagnosis and treatment would have prevented the patient's injury or death. In cases such as this one, it appears that a defendant would always be entitled to summary judgment.

*Id.* at 1387.

■ After determining that a traditional proximate cause analysis would be inequitable in certain medical malpractice actions, the Court examined the "pure loss of chance" and "increased risk of harm" standards of causation. Rejecting a "pure loss

of chance"[7] standard of causation in *Mayhue,* the Court held that Section 323 was the appropriate mode of analysis of a claim for injuries that had been sustained, but which were more likely than not to have occurred even in the absence of any negligence, concluding that standard was the "most consistent with Indiana law." *See id.* at 1388–89. Because the Court adopted the "increased risk of harm" standard of causation, plaintiffs with a less than fifty percent (50%) chance of recovery, who have suffered a decreased chance of recovery from illness or injury due to the negligence of a health care provider, are provided with a means of recovery.

In order to prove a doctor's liability under a Section 323 analysis, a plaintiff must demonstrate that the defendant was negligent, the negligent act increased the risk of harm, and that the increased risk was a substantial factor in causing the harm suffered to plaintiff. *Cahoon v. Cummings,* 715 N.E.2d 1, 7 (Ind. Ct.App.1999) (citing *Mayhue,* 653 N.E.2d at 1388). Before a plaintiff in a medical malpractice action may invoke the "increased risk of harm" standard, the plaintiff must establish that it is within the class of plaintiffs to which the lesser standard of causation under Section 323 may be applied. If a plaintiff cannot carry its burden to invoke Section 323, the traditional standard of proximate cause will be applicable.

We do not believe that the facts of the present case entitled the plaintiffs to the lesser standard of causation contained in Section 323 and described in their Proposed Final Instruction No. 10. The crux of the plaintiffs' argument at trial was that if Dr. Cobb had tested Laura for gestational diabetes during her pregnancy with Sabria, he would have foreseen that Sabria would be a macrosomic child at birth and thus, would have elected to perform a caesarean section rather than advising Laura to give birth to Sabria naturally. If Dr. Cobb had performed the c-section, Sabria would not have incurred the shoulder dystocia, and thus, would not have suffered the brachial plexus injury. Thus, the injury Sabria suffered at birth was a natural and probable consequence of Dr. Cobb's failure to perform a c-section, which could have been reasonably foreseen and anticipated if he had tested Laura for gestational diabetes during her pregnancy. Dr. Cobb's failure to perform the glucose test essentially set in motion a chain of events which culminated in Sabria incurring an injury during birth because her large size made it difficult for her to freely pass Laura's pubic bone.

Therefore, the plaintiffs were required to prove at trial that proper diagnosis and treatment would have prevented Sabria's injuries, essentially the traditional standard of causation. Because the facts of the present case do not entitle the plaintiffs to the lesser standard of causation under Section 323, we hold that the trial court did not err in tendering modified Final Instruction No. 4 to the jury which contained the traditional standard of causation in medical malpractice actions in Indiana or in refusing the plaintiffs' Proposed Final Instruction No. 10 regarding the "increased risk of harm" standard.

---

**7.** The "pure loss of chance" doctrine compensates for the loss of the chance itself and not for the plaintiff's physical injury that was incurred but likely even before the defendant's act or omission. In a pure loss of chance case, "[t]he compensable injury is not the result, which is usually death, but the reduction in the probability that the patient would recover or obtain better results if the defendant had not been negligent." *Mayhue,* 653 N.E.2d at 1387–88. Recently, the Indiana Supreme Court held that plaintiffs may maintain a cause of action in negligence for the increased risk of harm, which may be described as a decreased life expectancy or the diminished probability of long-term survival. *Alexander & Alexander v. Scheid & Orthopaedics Indianapolis, Inc.,* 726 N.E.2d 272, 281–282 (Ind.2000). Thus, in medical malpractice actions, plaintiffs may recover for negligence that has "increased the risk of harm," even where the full ramifications of the health care provider's actions are not yet known.

## II. Motion to Correct Errors

The plaintiffs also contend that the trial court erred in denying their Motion to Correct Errors[8] pursuant to Trial Rules 50 and 59. We disagree.

### A. Standard of Review for Motion to Correct Errors

A trial court has wide discretion to correct errors and to grant new trials. *Gregor v. State*, 646 N.E.2d 52, 53 (Ind.Ct.App.1994). We will reverse only for an abuse of discretion. *Id.* An abuse of discretion will be found when the trial court's action is against the logic and effect of the facts and circumstances before it and the inferences which may be drawn therefrom. *Id.* An abuse of discretion also results from a trial court's decision that is without reason or is based upon impermissible reasons or considerations. *Id.* When a trial court has granted a new trial pursuant to Trial Rules 59(C) or T.R. 59(J), the granting of that relief is afforded a "strong presumption of correctness." *Huff v. Travelers Indem. Co.*, 266 Ind. 414, 363 N.E.2d 985, 994 (1977). However, a trial court does not commit reversible error if it denies a new trial where the evidence is conflicting. *Ingersoll–Rand Corp. v. Scott*, 557 N.E.2d 679, 683 (Ind.Ct. App.1990), *trans. denied.*

### B. Trial Rule 50

The plaintiffs argue that the trial court erred refusing to grant their Motion to Correct Errors pursuant to Trial Rule 50. We disagree.

On appeal, we use the same standard of review as the trial court in determining the propriety of a judgment on the evidence. *Liberty Mut. Ins. Co. v. Blakesley*, 568 N.E.2d 1052, 1057 (Ind.Ct. App.1991). When the trial court considers a motion for judgment on the evidence, it must view the evidence in a light most favorable to the non-moving party. *Id.* Judgment may be entered only if there is no substantial evidence or reasonable inferences to be drawn therefrom to support an essential element of the claim.

Indiana Trial Rule 50(C) provides in pertinent part that:

> When a judgment on the evidence is sought before or after the jury is discharged, the court may grant a new trial as to part or all of the issues in lieu of a judgment on the evidence when entry of a judgment is impracticable or unfair to any of the parties or otherwise is improper, whether requested or not.

Under Trial Rule 50(C), the trial court may not act as a "thirteenth juror" and weigh the evidence or judge witness credibility. *Keith v. Mendus*, 661 N.E.2d 26, 31 (Ind.Ct.App.1996), *trans. denied.* The trial court may only order a new trial as the "thirteenth juror" under Trial Rule 59(J). *Id.*

After reviewing the record in its entirety and considering the evidence in the light most favorable to Dr. Cobb, we believe that the trial court did not abuse its discretion in refusing to grant the plaintiffs' Motion to Correct Errors pursuant to Trial Rule 50. Although the trial court expressed some dissatisfaction with the jury's verdict, the court nevertheless declined to grant a new trial. *See* R. 259. We agree with the trial court that there

---

8. We note that the plaintiffs submitted affidavits from the individuals who sat as jurors in the present case, affidavits which essentially stated that the jury would have returned a verdict in favor of the plaintiffs if the trial court had tendered to them the "increased risk of harm standard" of causation. R. 167–78. It has long been established in Indiana that a jury's verdict may not be impeached by the testimony of the jurors who returned it.

*Ward v. St. Mary Med. Ctr. of Gary*, 658 N.E.2d 893, 894 (Ind.1995). The policy reasons most often cited for supporting this rule are that: 1) there would be no reasonable end to litigation; 2) jurors would be harassed by both sides of litigation; and 3) an unsettled state of affairs would result. *Id.* Therefore, we refuse to consider the affidavits of the jurors in determining the disposition of this case.

exists abundant evidence in the record to support the jury's verdict.

Dr. James A. Hall, an Obstetrician/Gynecologist ("Ob/Gyn"), testified that in 1987, the standard of care for testing individuals for gestational diabetes was to test only those who exhibited certain risk factors. R. 295. Dr. Hall further testified that Laura did not display any significant symptoms[9] during her pregnancy to alert Dr. Cobb that a test for gestational diabetes was needed. *Id.* Dr. Hall also testified that if Laura had been under his care during her pregnancy, he would have not deemed it necessary to test her for gestational diabetes. R. 1861. According to Dr. Hall, he did not believe that Laura was a gestational diabetic during her pregnancy with Sabria. R. 1862. Furthermore, Dr. Hall stated that macrosomia can occur in the absence of gestational diabetes. R. 1865.

In addition, Dr. Lynn Bemenderfer, board certified in Ob/Gyn and a member of the Medical Review Panel, testified at trial that although she believed that Dr. Cobb breached the standard of care by failing to test for gestational diabetes, she could not conclude with certainty whether or not this failure to test was a factor in the resultant damages to the plaintiffs. R. 1651–53. Dr. Bemenderfer also stated that in 1987, universal screening of pregnant women for gestational diabetes was not recommended. R. 1655. In addition, Dr. David J. Kenley, board certified in Ob/Gyn and also a member of the Medical Review Panel, testified at trial that there was no indication based upon Laura's prenatal medical records that Sabria would be a macrosomic infant at birth. R. 1785, 1789.

Dr. Cobb also testified at trial, stating he tested Laura's urine via a urine dipstick, for proteins and sugar upon each visit to his office. R.1967. He stated that the test results revealed no indication that Laura had gestational diabetes. *Id.* At trial, Dr. Cobb further testified that he had no reason to believe that Sabria would be a macrosomic infant because Laura's fundal height[10] and earlier ultrasounds gave no indication that Sabria would be of abnormal size at birth. R.1959, 1971. Moreover, Dr. Cobb stated that typically the glucose test utilized to test for gestational diabetes was administered to patients only where the patient: 1) was over the age of thirty-five years old; 2) spilled sugar in their urine; or 3) had an immediate family member who was diabetic. R.1968. In Dr. Cobb's opinion, there was no evidence to indicate that such a test was warranted during Laura's pregnancy. *Id.*

Although plaintiffs introduced experts at trial whose testimony conflicted with Dr. Cobb's experts, we believe that there was abundant evidence in the record to support the jury's determination that Dr. Cobb was not liable for medical malpractice. The Indiana Supreme Court has stated that "[w]here the evidence is such that the minds of reasonable men might differ, a directed verdict is improper, and the resolution of conflicting evidence is for the jury." *Vernon Fire & Cas. Ins. Co. v. Sharp,* 264 Ind. 599, 349 N.E.2d 173, 179 (1976). Therefore, we agree with the trial court that there was sufficient evidence in the record to support the jury's verdict, and thus, we hold that the trial court properly denied the plaintiffs' Motion to Correct Errors pursuant to Trial Rule 50.

### C. Trial Rule 59

The plaintiffs also argue that the trial court erred in denying their Motion to Correct Errors pursuant to Trial Rule 59(J). Again, we disagree.

---

9. Dr. Hall listed the symptoms as: 1) a significant family history of diabetes; 2) previous problems with blood sugar; 3) previous birth of macrosomic children; and 4) gylcosuria, or spilling of the sugar in urine during pregnancy. R. 295.

10. Dr. Cobb testified at trial that one determines a woman's "fundal height" by measuring from the pubic bone to the top of the uterus. R.1969.

Indiana Trial Rule 59(J) provides in pertinent part that:

> The court, if it determines that prejudicial or harmful error has been committed, shall take such action as will cure the error, including without limitation the following with respect to all or some of the parties and all or some of the errors:
>
> (1) Grant a new trial;
>
> (2) Enter final judgment;
>
> (3) Alter, amend, modify or correct judgment....

■ The "thirteenth juror" concept is found in Trial Rule 59(J)(7) pursuant to which the trial court may weigh evidence and judge witness credibility. *Jones v. State*, 697 N.E.2d 57, 59 (Ind.1998). When sitting as a "thirteenth juror" the trial court may order a new trial if the jury's verdict is against the weight of the evidence. *State v. McKenzie*, 576 N.E.2d 1258, 1260 (Ind.Ct.App.1991), *trans. denied; see also Thompson v. State*, 590 N.E.2d 633, 634 (Ind.Ct.App.1992) (sitting as a thirteenth juror the trial court "must determine whether in the minds of reasonable men a contrary verdict should have been reached.")

When granting a new trial on grounds that the jury verdict is against the weight of the evidence, the trial court is required to enter special findings of fact setting forth the "supporting and opposing evidence to each issue upon which a new trial is granted." *Moore v. State*, 273 Ind. 268, 403 N.E.2d 335, 336 (1980) (quoting Trial Rule 59(I)(7), the predecessor to Trial Rule 59(J)(7)). The procedural requirements enumerated in Trial Rule 59(J) and the process of making the requisite special findings have been characterized as "arduous and time consuming." *See McKenzie*, 576 N.E.2d at 1260. However, the purpose of these requirements is to provide the parties and the reviewing court with the theory of the trial court's decision. *Malacina v. Malacina*, 616 N.E.2d 1061, 1062 (Ind.Ct.App.1993).

■ The trial court stated in its order that it could not find any error upon which to grant the plaintiffs a new trial. Although Trial Rule 59(J) allows the trial court discretion to grant a new trial on a Motion to Correct Errors, the court must first determine that prejudicial or harmful error has been committed which can be corrected by granting appropriate relief. *DeVittorio v. Werker Bros., Inc.*, 634 N.E.2d 528, 532 (Ind.Ct.App.1994). Although the trial court did not find prejudicial or harmful error, the court stated in its order denying the plaintiffs' Motion to Correct Errors that "[i]t is not surprising that the jury would have found for the plaintiffs in this case if Dr. Cobb's negligence only had to be a substantial factor in Sabria's injuries, as opposed to proximately causing them." R. 259. The trial court's order refers to the "increased risk of harm" standard for medical malpractice actions in Indiana, a standard which we have already determined was inapplicable to the present case.

Furthermore, the order provides that "[i]f this had been a bench trial, the undersigned would have found for the plaintiffs." R. 258. After reviewing the conflicting evidence introduced at trial, it is apparent that the trial court gave credence to the plaintiffs' expert testimony that Dr. Cobb committed medical malpractice and that his negligence caused the plaintiffs' resultant injuries. *See* R. 259. The trial court was clearly troubled by the inadequate and poor medical records of Sabria's birth, stating that "[g]iven the conflicts in the expert testimony, these erroneous and conflicting records in the Court's mind discredited Dr. Cobb's testimony and tipped the balance in favor of the plaintiffs." *Id.*

■ Indiana courts have the inherent power to grant new trials sua sponte and are expressly authorized to do so by Trial Rule 59(B). The court may grant a new trial if the evidence conflicts, so long as it preponderates in favor of the losing party. *Ingersoll–Rand Corp.*, 557 N.E.2d at 683. However, a trial court does not

commit reversible error if it denies a new trial where the evidence is conflicting. *Id.* The "[m]ere conflicts or inconsistencies in testimony favoring the verdict do not give rise to mandatory operation of the Thirteenth Juror Principle." *Id.* at 684. This is especially true in medical malpractice actions where often the evidence turns upon a "battle of the experts," essentially each party presenting conflicting testimony at trial as to the applicable standard of care and whether particular acts or omissions by the health care provider measure up to the standard of care. *Simmons v. Egwu,* 662 N.E.2d 657, 658 (Ind.Ct.App. 1996), *trans. denied.* Because our review of the record reveals that the jury's verdict is supported by the evidence presented at trial, we do not believe that the verdict was unreasonable or improper.

In addition, although the trial court opined that it would have reached a different result than that reached by the jury, the trial court recognized that "reasonable persons disagree," and that "setting aside a jury verdict is extreme." R. 259. Where reasonable minds could draw different inferences from the evidence submitted, it is for the jury to make the determination of proximate cause. *S & S Truck Repairs v. Mofield,* 556 N.E.2d 1313, 1314 (Ind.1990). It is improper for Indiana appellate courts to invade the province of the jury in weighing such evidence. *Id.* Thus, the trial court properly denied the plaintiffs' Motion to Correct Errors pursuant to Trial Rule 59(J).

### Conclusion

Based on the foregoing, we hold that the trial court did not err in tendering modified Final Instruction No. 4 to the jury which contained the traditional standard of causation in medical malpractice actions. In addition, we hold that the trial court properly denied the plaintiffs' Motion to Correct Errors pursuant to Indiana Trial Rule 50 and 59 because there was abun-

dant evidence in the record to support the jury's verdict.

Affirmed.

BROOK, J., and DARDEN, J., concur.