Julian PENDLETON, Appellant–Plaintiff,

v.

Manuel AGUILAR and National Transportation Corp., Appellees–Defendants.

No. 45A03–0404–CV–153.

Court of Appeals of Indiana.

May 19, 2005.

Rehearing Denied July 26, 2005.

David W. Holub, Ruman, Clements & Holub, P.C., Hammond, IN, Attorney for Appellant.

Kristin A. Mulholland, Steven P. Polick, Steven P. Polick & Associates Highland, IN, Attorneys for Appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Plaintiff, Julian Pendleton (Pendleton), appeals the trial court's Order granting Appellees'-Defendants', Manuel Aguilar and National Transportation Corporation (collectively, Aguilar), Motion for Set-off for workers' compensation benefits. On cross-appeal, Aguilar appeals the trial court's Order denying his Motion to Correct Error.

We reverse, in part, and remand, in part.

### ISSUES

Pendleton raises three issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court erred in entering a post-verdict set-off of collateral source reimbursement where evidence of the collateral source reimbursement was presented to a jury and the jury was instructed on non-duplication of recovery; and

(2) Whether the trial court violated the provision of the Illinois Guaranty Fund by entering a post-verdict set-off of collateral source reimbursements.

On cross-appeal, Aguilar raises three issues, which we consolidate and restate as the following two issues:

(1) Whether the trial court erred in denying Aguilar's Motion to Correct Error requesting a new trial pursuant to Indiana Trial Rule 59(J); and

(2) Whether the trial court erred in denying the introduction of the collateral source reimbursement made to

Pendleton by his employer's uninsured motorist carrier.

*FACTS AND PROCEDURAL HISTORY*

On April 30, 1999, Pendleton, a Florida resident, was involved in a truck accident when the tractor trailer he was operating was struck from the rear on westbound I–80 near Hammond, Indiana, by Aguilar, an Illinois resident. At the time, Pendleton was employed by Timely Transport; Aguilar was working for National Transportation Corporation. As a result of this accident, Pendleton suffered a nerve-impinging disc herniation and has been unable to return to work.

On February 1, 2001, Pendleton filed a complaint for damages against Aguilar and National Transportation Corporation. During the pendency of the action, the Commonwealth Court of Pennsylvania declared National Transportation Corporation's insurance carrier, Reliance Insurance Company (Reliance), insolvent. The Pennsylvania Court ordered the appointed liquidator to make arrangements for payment of claims against the insolvent Reliance through the appropriate insurance guaranty funds.

On September 8, 2003, Aguilar filed his Motion to Enforce the Non–Duplication of Recovery Provisions of the Illinois Insurance Guaranty Act (Illinois Act), requesting the trial court to determine the amount of the set-offs which would apply pursuant to the Illinois Act as well as to rule on the admissibility of evidence of collateral source payments made to Pendleton under the Indiana Collateral Source Rule. On October 9, 2003, after receiving Pendleton's Response, the trial court held a hearing on Aguilar's motion. Thereafter, on October 29, 2003, the trial court ordered, in pertinent part,

1. This case is against a trucking company and its driver, not a guaranty fund;

consequently, issues of insurance priority and set-off are not now properly before this court.

2. Until a judgment is obtained, the issue of set-off is not ripe for decision by this court.

3. Any rulings on set-off will be issued by this court after a judgment is obtained and after a hearing is held post-judgment to address the set-off issue.

4. The admissibility of collateral source payment evidence shall be decided by this court during the course of trial pursuant to the Collateral Source Rule which is codified in Indiana Code § 34–44–1–2.

(Appellant's App. p. 112).

On November 3 through November 5, 2003, a jury trial was held on the issue of damages only. During the trial, Pendleton introduced evidence of collateral source payments, *i.e.*, his receipt of Florida worker's compensation payments in the amount of $122,877.34. In closing argument, Pendleton sought recovery for pain and suffering, future lost earnings, and all other non-reimbursed damage elements, for a total amount of $570,000. Prior to deliberation, the trial court instructed the jury that "the plaintiff may not recover more than once for any item of loss sustained." (Appellant's App. p. 111). At the close of the trial, the jury returned a damage award of $422,000 and assessed Aguilar to be 80% at fault. That same day, the trial court entered judgment against Aguilar in the amount of $337,600.

On December 5, 2003, Aguilar filed a post-trial Motion for Set–Off, asking the trial court to enter a post-judgment set-off of $122,877.34 in paid benefits. On the same date, Aguilar also filed his Motion to Correct Error, alleging an excessive verdict. After Pendleton filed a response to both motions, the trial court heard argu-

ments on February 2, 2004. Subsequently, in its Order of March 2, 2004, the trial court denied Aguilar's Motion to Correct Error but granted his Motion for Set-off, reducing Pendleton's damage award to $164,722.66. This Order states in pertinent part that:

The court, having taken under advisement [Aguilar's] Motion to Correct Errors and Motion for Set-offs, now finds and orders as follows:

1. The jury verdict was within the scope of the evidence presented at trial and there is no basis for granting [Aguilar's] Motion to Correct Errors.

2. [Aguilar's] Motion to Correct Errors should be and is hereby DENIED.

3. [Aguilar] [was] insured by [Reliance].

4. On October 3, 2001, the Commonwealth Court of Pennsylvania entered an order declaring [Reliance] insolvent. The Pennsylvania court ordered the liquidator in that case to make arrangements for payment of claims by and through the appropriate guaranty associations.

5. Every state in the country has created an insurance guaranty fund in order to protect claimants and policyholders if insurance carriers become insolvent. The Indiana fund was created by Indiana Code § 27–6–8–1 et seq. The Illinois fund was created in the Illinois Insurance Code Article XXXIV Illinois Guaranty Fund, 215 UKCS 5. Both acts contain very similar provisions.

6. Both the Indiana and Illinois Acts state that recovery in this case should be made from the guaranty association of the place of the residence of the insured.

7. National Transportation Corporation is an Illinois corporation and is the named insured under the Reliance policy. Therefore, the [Illinois Act] applies to this case and should be used to determine whether there is a non-duplication of recovery in this case.

8. In order to make a claim against the Illinois Insurance Guaranty Fund (hereinafter "Fund"), a claimant must prove that he or she has a "covered claim" as it is defined in the state. " 'Covered claim' means an unpaid claim for a loss arising out of and within the coverage of an insurance policy to which this Article applies and which is in force at the time of the occurrence giving rise to the unpaid claim, ..." 215 ILCS 5/534.3(a).

9. The Illinois Act states that the amount payable for a covered claim is limited by the "other insurance" statute section which requires that an insured or claimant be required to first exhaust all other insurance coverage available. Upon payment by any other insurer, the Fund's obligation to pay a covered claim "shall be reduced by the amount recovered or recoverable, which ever is greater, under such insurance policy. Where such other insurance policy provides uninsured or underinsured motorists coverage, the amount recoverable shall be deemed to be the full applicable limits of such coverage." 215 ILCS 5/546(s). The liability of the insured under the insolvent's insurer's policy is also reduced. "To the extent that the Fund's obligation under Section 537.2 is reduced by application of this Section, liability of the person insured by the insolvent's insurer's policy for the claim shall be reduced in the same amount." Id.

10. The Illinois Act also provides that a claimant having a worker's compensation claim which may be recovered from an Insurance Guaranty Fund must first seek recovery from the Fund of his or her residence. "Any recovery under this Article should be reduced by the

amount of the recovery from any other Insurance Guaranty Fund or its equivalent." 215 ILCS 5/546(b).

11. [Pendleton] received payments totaling $122,877.34 for a worker's compensation claim from America All–Risk Loss Administrators on behalf of the Florida Workers' Compensation Insurance Guaranty Fund.

12. At the time of the accident, [Pendleton] was insured for uninsured motorist coverage under policy 1STP20000146 and/or 1STP20001454 by InterCargo Insurance Company with coverage in the amount of $40,000.00.
* * *

14. The request of [Aguilar] for set-off from the jury's verdict herein in accordance with the non-duplication of recovery provision of the Illinois Insurance Guaranty Fund Act, should be and is hereby GRANTED.

15. The court now finds that [Aguilar] is entitled to set-offs in the total amount of $172,877.34 and accordingly the jury verdict is ordered reduced by said amount.

16. The liability of [Aguilar] herein shall be limited to $164,722.66 and judgment for said amount shall be entered and any previous judgment entered is hereby vacated and set aside.

(Appellant's App. pp. 19–21).

Pendleton now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Pendleton's Appeal

Pendleton contends that Indiana's statutory treatment of collateral source evidence allows the trier-of-fact to determine the damage award a plaintiff is entitled to, thereby taking into account any collateral payments a plaintiff may already have received for his loss. Thus, Pendleton continues, since he presented evidence of a collateral source payment received from the Florida worker's compensation benefits to the jury, the jury made the set-off during the deliberation. Accordingly, Pendleton alleges, the trial court erred by ordering another set-off pursuant to the Illinois Guaranty Fund in its Order of March 2, 2004.

### A. Standard of Review

In the instant case, we are called upon to interpret Indiana's statute concerning collateral source evidence, as enacted in I.C. § 34–44–1–1 et seq. A question of statutory interpretation is a matter of law to be determined de novo by this court. Ind. Ins. Guar. Ass'n v. Blickensderfer, 778 N.E.2d 439, 441 (Ind.Ct.App.2002). We are not bound by a trial court's legal interpretation of a statute and need not give it deference. Id. We independently determine the statute's meaning and apply it to the facts before us. Id.

During our review, the express language of the statute and the rules of statutory construction apply. Id. at 442. We will examine the statute as a whole, and avoid excessive reliance on a strict literal meaning or the selective reading of words. Id. Where the language of the statute is clear and unambiguous, there is nothing to construe. Id. However, where the language is susceptible to more than one reasonable interpretation, the statute must be construed to give effect to the legislature's intent. Id. The legislature is presumed to have intended the language used in the statute to be applied logically and not to bring about an unjust or absurd result. Id. Further, we are compelled to ascertain and execute legislative intent in such a manner as to prevent absurdity and difficulty and prefer public conscience. Id. In so doing, we are required to keep in mind the object and purpose of the law as well

as the effect and repercussions of such a construction. *Id.*

## B. *Indiana's Collateral Source Payments*

Pendleton first contends that the trial court erred by entering its Order of March 2, 2004, ordering a set-off of the collateral source payments, where evidence of this payment was properly presented to the jury during trial and the trial court specifically instructed the jury on the prohibition of duplicate recovery pursuant to I.C. § 34–44–1–1.

Until recently, Indiana recognized the common law collateral source rule which prohibited defendants from introducing evidence of compensation received by plaintiffs from collateral sources, *i.e.*, sources other than the defendant, to reduce damage awards. *Shirley v. Russell,* 663 N.E.2d 532, 534 (Ind.1996). As a result, there could be no abatement of damages when partial compensation was received for an injury from a collateral source independent of the one responsible for the loss, and thus, tortfeasors were held fully accountable for the consequences of their conduct.

■ However, our legislature abrogated the common law collateral source rule when, in 1986, it enacted the statute implicated by this case. The purpose of this new collateral source rule statute is to determine the actual amount of the prevailing party's pecuniary loss and to preclude that party from recovering more than once from all applicable sources for each item of loss sustained in a personal injury or a wrongful death action. I.C. § 34–44–1–1; *see also id.* at 535. In fact, the new statute abrogated both the substance and the procedure of the common law collateral source rule. Substantively, instead of tortfeasors being held fully accountable for their conduct, now victims may not recover more than once for each

item of loss sustained. I.C. § 34–44–1–1(2). Procedurally, instead of evidence of collateral source payments being prohibited, now evidence of collateral source payments may not be excluded except for the specified statutory exceptions. In particular, I.C. § 34–44–1–2 provides, in pertinent part, that:

> in a personal injury or wrongful death action, the court shall allow the admission into evidence of:
>
> (1) proof of collateral source payments other than:
>
> (A) payments of life insurance or other death benefits;
>
> (B) insurance benefits for which the plaintiff or members of the plaintiff's family have paid for directly; or
>
> (C) payments made by:
>
>> (i) the state or the United States; or
>>
>> (ii) any agency, instrumentality, or subdivision of the state or the United States;
>>
>> that have been made before trial to a plaintiff as compensation for the loss or injury for which the action is brought.

Evidence of these amounts shall be considered by the trier-of-fact in arriving at the amount of any award and shall be considered by the trial court in reviewing awards that are alleged to be excessive. I.C. § 34–44–1–3.

Here, the record shows that after evidence of collateral source payments, consisting of Florida worker's compensation benefits, was introduced at trial, the trial court specifically ruled on its admissibility pursuant to I.C. § 34–44–1–2(1). After determining that payment of the worker's compensation benefits were not included within the statutory exceptions, the trial court, pursuant to its Order of October 29,

2003, ruled the evidence of collateral source payments to be admissible. The record further establishes that, during closing arguments, both Pendleton and Aguilar urged the jury to take the amount of collateral source payments into account in their calculation of the damage award and not to duplicate the payments received from the Florida worker's compensation benefits.

Moreover, the record indicates that the trial court separately instructed the jury on the collateral source payments. In particular, the trial court gave the jury the following limiting instruction:

If you find that [Pendleton] is entitled to recover, you shall consider evidence of payment made by some collateral source to compensate [Pendleton] for damages resulting from the accident in question. In determining the amount of [Pendleton's] damages, you must consider the following types of collateral source payments:

Payments for worker's compensation

In determining the amount received by [Pendleton] from collateral sources, you may consider any amount [Pendleton] is required to repay to a collateral source and the cost to [Pendleton] of collateral benefits received. [Pendleton] may not recover more than once for any item of loss sustained.

(Appellant's App. p. 111). The jury returned a general verdict of $422,000 in damages and assessed Aguilar to be 80% at fault.

■ It is well established that on appeal, we will presume the jury followed the law contained within the trial court's instruction and applied that law to the evidence before it. *Tipmont Rural Elec. Membership Corp. v. Fischer*, 697 N.E.2d 83, 90 (Ind.Ct.App.1998), *reh'g denied.* Thus, we refuse to attempt to interpret the thought process of the jury in arriving at its verdict. *Tincher v. Davidson*, 762 N.E.2d 1221, 1224 (Ind.2002). Accordingly, we must conclude that the jury followed the limiting instruction on collateral source payments and took Pendleton's worker's compensation benefits into account in arriving at its damage award.

Nevertheless, the trial court, in its Order of March 2, 2004, granted Aguilar's motion for a post-verdict set-off and reduced the damage award by $122,877.34. By subtracting the collateral source payments again from the jury's verdict, the trial court, in effect, ordered a double set-off. Mindful of the legislature's intent to deny a claimant from recovering more than once from all applicable sources for each item of loss sustained in a personal injury or a wrongful death action, we find that under the circumstances of this case, the trial court, rather than awarding a double windfall to Pendleton, allowed a double credit or set-off to Aguilar. *See* I.C. § 34–44–1–1. Applying the legislature's intent and clear language of the statute logically, we conclude that the statute never intended a tortfeasor to be relieved of his responsibility for damages beyond the statutory provisions at issue in this case. Nonetheless, our review does not end here. Although we find that a double set-off is not allowed under the Indiana Collateral Source Statute, we next need to determine whether a second set-off can be ordered under the Illinois Guaranty Fund.

### C. *Collateral Source Payments under the Illinois Guaranty Fund*

■ Pendleton claims that (1) the Illinois Act is not applicable and (2) even assuming *arguendo* that the Illinois Act applies, nothing in the statute entitles Aguilar to a double set-off for Pendleton's worker's compensation benefits.

First, we find the Illinois Act to be applicable to the case at hand. Even though the accident occurred in Indiana, the clear language of Indiana's Insurance Guaranty Association Law directs us to Illinois' Insurance Guaranty Fund (Illinois Fund). Specifically, I.C. § 27–6–8–11(b) (emphasis added) provides that:

> [a]ny person having a claim which may be recovered under more than one (1) insurance guaranty association or its equivalent *shall seek recovery first from the association of the place of residence of the insured* except that if it is a first party claim for damage of property with a permanent location, the person shall seek recovery first from the association of the residence of the claimant.

At the time of the accident, both Aguilar and his employer were insured by Reliance. On October 3, 2001, the Commonwealth Court of Pennsylvania entered an order declaring Reliance to be insolvent. As a result, the Pennsylvania court ordered the appointed liquidator for Reliance to make arrangements for payment of claims by and through the appropriate guaranty provisions. Here, the insureds of Reliance, Aguilar and his employer, are both Illinois residents. Consequently, the Illinois Act is applicable.

■ Every state has established an insurance guaranty fund to protect policyholders in the event that an insurance company becomes insolvent. *Hasemann v. White*, 177 Ill.2d 414, 226 Ill.Dec. 788, 686 N.E.2d 571, 572 (1997). The Illinois Act, which is based on the Model Property and Casualty Post–Assessment Guaranty Association Act, requires all insurance companies authorized to transact business in Illinois to be members of the Illinois Fund. *Id.* It is available to all claimant or insured residents of Illinois. 215 ILCS 5/534.3(ii). The principal obligation of the Illinois Fund is to pay "covered claims,"

which are defined as: "unpaid claim[s] for a loss arising out of and within the coverage of an insurance policy to which this [a]rticle applies and which is in force at the time of the occurrence giving rise to the unpaid claim, ..." 215 ILCS 5/534.3(a). However, before a claimant possessing a covered claim can recover from the Illinois Fund, he must exhaust his rights under any other insurance policy applicable to the loss. The Illinois Act expressly provides in article 215 ILCS 5/546 (emphasis added):

> (a) An insured or claimant shall be required first to exhaust all coverage provided by any other insurance policy, ..., if the claim under such other policy arises from the same facts, injury, or loss that gave rise to the covered claim against the Fund. The Fund's obligation ... shall be reduced by the amount recovered or recoverable, whichever is greater, under such other insurance policy.
>
> (b) Any insured or claimant having a claim which may be recovered under more than one insurance guaranty fund or its equivalent shall seek recovery first from the Fund of the place of residence of the insured ...; *if it is a workers' compensation claim, he shall first seek recovery from the Fund of the residence of the claimant. Any recovery under this Article shall be reduced by the amount of the recovery from any other insurance guaranty fund or its equivalent.*

The rationale for this nonduplication provision in the Illinois Act is to ensure that the Illinois Fund is a recovery of last resort by requiring that the claimant first seek to cover his loss with funds available from other insurers. *Hasemann*, 226 Ill.Dec. 788, 686 N.E.2d at 574.

Here, as residents of Illinois, both Aguilar and his employer were defended by the

Illinois Fund after Reliance was declared insolvent. The record establishes that when Pendleton's employer's worker's compensation insurer became insolvent, Pendleton received $122,877.34 in worker's compensation benefits from the Florida Insurance Guaranty Fund, Pendleton's place of residency. Thus, as partial payment for his damages, Pendleton received collateral source payments in the form of worker's compensation benefits from the insurance fund of his place of residency. *See* 215 ILCS 5/546(b). Consequently, since Pendleton received recovery from another insurance guaranty fund, this collateral source payment has to be deducted from the claim submitted to the Illinois Fund. *See id.*

Aguilar now claims that he is entitled to a double set-off: once under the Indiana Collateral Source Rule and again under the mandatory provisions of the Illinois Act. In support of this argument, Aguilar contends that the set-off required by the Illinois Act is not dependent on any evidentiary ruling in the underlying trial. We are not persuaded.

Our review of the Illinois Act fails to find any specifications as to how and when this set-off of collateral payments should be performed. Rather, the Illinois Act merely requires a deduction of amounts already recovered for a claim arising from the same injury that gave rise to the covered claim against the Illinois Fund. *See* 215 ILCS 5/546(a). This is in line with the intent of the Illinois legislature that all potential claims against the Illinois' Funds' assets should first be reimbursed by a solvent insurer, and not the Illinois Fund, whenever possible. *Harrell v. Reliable Ins. Co.*, 258 Ill.App.3d 728, 197 Ill.Dec. 293, 631 N.E.2d 296, 297 (1994). Thus, insurance associations such as the Illinois Fund are created for the purpose of providing a limited protection to the public

and not to insurance companies. *Id.* 258 Ill.App.3d 728, 197 Ill.Dec. 293, 631 N.E.2d at 298.

We conclude that the set-off under Indiana's collateral evidence rule satisfies Illinois' dual goal of nonduplication of recovery and protection of the public. By applying Indiana's statutory provisions on collateral source payments, the jury properly deducted Florida's payment of worker's compensation benefits from the total damage award payable by Aguilar. Accordingly, the jury award of November 5, 2002, precluded Pendleton from recovering more than once from all applicable insurance guaranty funds for his worker's compensation benefits sustained as a result of his personal injury. *See* I.C. § 34–44–1–1. With this award, the jury not only satisfied the intent of Indiana's Collateral Source Rule, but also complied with the nonduplication requirements of the Illinois Act. However, by allowing a second set-off of the collateral source payments, the trial court's Order of March 2, 2004 resulted in a double credit or windfall for Aguilar. Since we determined that the Indiana Collateral Source Rule satisfies the Illinois Fund requirement of nonduplication of recovery, we hold that the trial court erred by reducing the jury award a second time with the amount of collateral source payments. Consequently, we reverse the trial court's Order of March 2, 2004.

### II. *Aguilar's Cross–Appeal*

#### A. *Indiana Trial Rule 59(J)*

On cross-appeal, Aguilar first alleges that the trial court abused its discretion by denying his Motion to Correct Error. Specifically, Aguilar alleges that based on the testimonial evidence presented at trial, the jury verdict was excessive and against the weight of the evidence. Therefore, Aguilar continues, based on this excessive jury verdict, the trial court should have used its common law power of remittitur

and entered final judgment or granted a new trial.

 When considering a motion to correct error and a request for a new trial, the trial court sits as a thirteenth juror and must determine whether in the minds of reasonable men a contrary verdict should have been reached. *See Chafin v. Grayson*, 761 N.E.2d 474, 476 (Ind.Ct.App. 2002). The trial court, as the thirteenth juror, hears the case along with the jury, observes the witnesses for their credibility, intelligence and wisdom, and determines whether the verdict is against the weight of the evidence. *Id.* Once a trial court has granted or denied a new trial, we will reverse this decision only for an abuse of discretion. *Id.* An abuse of discretion will be found when the trial court's action is against the logic and effect of the facts and circumstances before it and the inferences which may be drawn therefrom. *Id.* We review the record only to see if: (a) the trial court abused its discretion; (b) a flagrant injustice has occurred; or (c) the appellant has presented a very strong case for relief from the trial court's order granting a new trial. *Id.* However, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* The trial court has broad discretion to grant or deny a motion for a new trial and therefore we award the trial court's action with a strong presumption of correctness. *Id.*

 Indiana Trial Rule 59(J) governs the grant of a new trial upon a party's motion to correct error. This provision states, in pertinent part:

> (5) In the case of excessive or inadequate damages, [the court shall] enter final judgment on the evidence for the amount of the proper damages, grant a new trial, or grant a new trial subject to additur or remittitur;
>
> * * *

> (7) In reviewing the evidence, the court shall grant a new trial if it determines that the verdict of a non-advisory jury is against the weight of the evidence; and shall enter judgment, subject to the provisions herein, if the court determines that the verdict of a non-advisory jury is clearly erroneous as contrary to or not supported by the evidence, [ . . . ]

While T.R. 59(J) permits the trial court to weigh the conflicting evidence, it "is not intended to invite the trial court to cavalierly substitute his evaluation of the evidence in place of a contrary evaluation made by the jury." *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1055–56 (Ind.2003) (quoting *Ingersoll–Rand Corp. v. Scott*, 557 N.E.2d 679, 684 (Ind.Ct.App. 1990)). When, as in this case, the trial court declines to intervene and refuses to set aside the jury verdict, it is not the province of an appellate court to do so "unless the verdict is wholly unwarranted under the law and the evidence." *Id.* at 1056.

 The testimonial evidence in the current case is indicative of a "battle of the experts," with each witness presenting slightly varying testimony at trial. *See Dughaish ex. Rel. Dughaish v. Cobb*, 729 N.E.2d 159, 170 (Ind.Ct.App.2000), *trans. denied.* Dr. Gregory Keller (Dr. Keller), orthopedic surgeon, testified that Pendleton suffered a small disk herniation as a result of the vehicular accident. He clarified that even though Pendleton suffered from pre-existing chronic spondylosis and a degenerative disk disease, which were not attributable to the accident, nevertheless, Pendleton's injuries resulting from the accident amounted to a permanent impairment which influenced his employment. Dr. Stephen Pappas, a neurologist, stated that Pendleton's trauma could have been a combination of degenerative changes and the vehicular accident. He

added that, in his opinion, the accident could have accelerated Pendleton's disk herniation. Dr. Kenneth Seals, Pendleton's chiropractic physician, informed the jury that Pendleton's symptoms are consistent with his accident and resulting traumas.

Furthermore, Aguilar challenges Pendleton's claim of future lost earnings alleging that his medical condition does not preclude his continued employment as a long distance truck driver. With regard to his continued employment as a truck driver, Dr. Keller testified that Pendleton incurred a permanent impairment which will only worsen over time. Also, Dr. Charles Scarborough determined that the physical demands of a truck driver would continue to bruise the nerve root thereby making Pendleton's injuries permanent and progressive.

We have held before that where the evidence is variable or conflicting as to the nature, extent, and source of the injury, the jury is in the best position to determine the amount of damages, and we will not disturb that award. *Centennial Mortgage Inc. v. Blumenfeld*, 745 N.E.2d 268, 280 (Ind.Ct.App.2001). Based on the circumstances of this case, we do not find the jury verdict to be wholly unwarranted. *See Paragon Family Rest.*, 799 N.E.2d at 1056. Therefore, we conclude that the trial court did not commit reversible error by denying a new trial where the evidence is conflicting. *Dughaish*, 729 N.E.2d at 170.

B. *Uninsured Motorist Reimbursements*

Last, Aguilar argues that the trial court erred in excluding the collateral source payments made by the uninsured motorist carrier for Pendleton's employer. In particular, Aguilar alleges that evidence of collateral source payments made to Pendleton by his employer's uninsured motorist carrier does not qualify as one of the statutory exceptions to the general rule of admissibility of collateral source payments and, thus, should have been presented to the jury.

As with our review of Pendleton's contention regarding Indiana's Collateral Source Payments, we also determine Aguilar's argument on a *de novo* basis. *See Indiana Ins. Guar. Ass'n v. Blickensderfer*, 778 N.E.2d 439, 441 (Ind.Ct.App.2002). Thus, we are not bound by a trial court's legal interpretation of a statute and need not give it deference. *Id.* We independently determine the statute's meaning and apply it to the facts before us. *Id.*

Here, the record indicates that at the time of the accident, Pendleton was insured for uninsured motorist coverage under a policy issued and paid for by his employer. During trial, Aguilar raised the admissibility of Pendleton's receipt of the uninsured motorist settlement under the Indiana Collateral Source Rule. However, the trial court denied its admissibility. The record further established that the trial court, nevertheless, provided a post-verdict set-off in the amount of $40,000 uninsured motorist coverage limit pursuant to the relevant provisions of the Illinois Act in its Order of March 2, 2004.

In *Peele v. Gillespie*, 658 N.E.2d 954 (Ind.Ct.App.1995), *reh'g denied, trans. denied*, we were also confronted with collateral source payments originating from an underinsured motorist carrier. In *Peele*, we focused on the payee of the benefits and stated that "the [Indiana Collateral Source Rule] clearly states that collateral source payments in the nature of insurance benefits which the plaintiff or a member of his family have paid for directly are not admissible as evidence." *Id.* at 958. We premised that if "the legislature [had] intended to exclude underinsured motorist benefits paid to an insured by his own

insurer from the broad category of insurance benefits, ... it could have done so." *Id.* Thus, based on our standard of review, we refused to read such an exception into the statute. *Id.*

Unlike *Peele*, in the case before us today, the record clearly establishes that neither Pendleton, nor his family, paid directly for the uninsured motorist benefits. Instead, Pendleton's employer not only entered into the insurance policy to Pendleton's benefit, but also paid the premiums. Thus, pursuant to the unambiguous language of Indiana's Collateral Source Rule, uninsured motorist benefits paid for by the plaintiff's employer are admissible at trial and can be considered by the jury in arriving at a damage award. *See* I.C. §§ 34–44–1–1; 34–44–1–3. As a result, we find that the trial court erred in prohibiting the introduction of the uninsured motorist carrier payments at trial.

Nevertheless, even though the trial court abused its discretion, we conclude this error to be harmless. The trial court's March 2, 2004 Order deducted the full coverage in the amount of $40,000 under the uninsured motorist policy from the jury award pursuant to the set-off requirements of the Illinois Act. Regarding uninsured motorist coverage, the Illinois Court of Appeals held that the express language of the Illinois Act requires that any amount a claimant recovers from its insurer for uninsured motorist coverage has to be deducted from the Illinois Fund's liability. *See Lucas v. Ill. Ins. Guar. Fund*, 52 Ill.App.3d 237, 10 Ill.Dec. 81, 367 N.E.2d 469, 471 (1977); *Urban v. Loham*, 227 Ill.App.3d 772, 169 Ill.Dec. 805, 592 N.E.2d 292, 295 (1992); *see also Ind. Ins. Guar. Ass'n v. Davis*, 768 N.E.2d 902, 907 (Ind.Ct.App.2002), *trans. denied.* Accordingly, as we stated above, since we decided that the Illinois Act is applicable in the instant case, a set-off of collateral payments has to be performed. Because we also held that Indiana's Collateral Source Rule satisfies the set-off requirement under the Illinois Act, we conclude that Aguilar, as in the case of the worker's compensation benefits, is entitled to a single deduction of the uninsured motorist benefits. Here, this single set-off is satisfied by the trial court's Order of March 2, 2004. Consequently, we find that the trial court's error in denying Aguilar's motion to correct error requesting a set-off of the collateral source payments by the uninsured motorist carrier is harmless.

## CONCLUSION

Based on the foregoing, we find that the trial court erred in entering a post-verdict set-off of collateral source payments where evidence of the collateral source reimbursement was presented to the jury and the jury was instructed on non-duplication of recovery. We further find that Indiana's Collateral Source Rule satisfies the set-off requirements of the Illinois Fund, and therefore, the trial court erred in entering a second post-verdict set-off of collateral source payments. With regard to Aguilar's cross-appeal, we find that the trial court properly denied Aguilar's Motion to Correct Error under T.R. 59(J) and the trial court committed harmless error by denying the admission of collateral source payments made to Pendleton by his employer's uninsured motorist carrier.

Reversed in part and remanded in part.

ROBB, J., concurs.

CRONE, J., concurs in part and concurs in result in part with separate opinion.

CRONE, Judge, concurring in part and concurring in result in part.

I agree with the majority that the Indiana Collateral Source Statute does not allow a double set-off and that the trial

court erroneously did so with Pendleton's worker's compensation benefits. I do not agree, however, that the Illinois Act is applicable here. I believe that Indiana Code Section 27–6–8–11(b) controls and that the Illinois Act would not come into play unless and until Pendleton seeks recovery from the Illinois Fund, presumably in proceedings supplemental. Therefore, I respectfully concur in result as to that issue. In all other respects, I fully concur in the lead opinion.