**DEPARTMENT OF FINANCIAL IN-STITUTIONS and Steve Carter, Attorney General of Indiana, Appellants–Plaintiffs,**

v.

**MEGA NET SERVICES, American Cash.Net, Planet Cash, and Cash Links, Appellees–Defendants.**

No. 18A04–0403–CV–157.

Court of Appeals of Indiana.

Aug. 29, 2005.

 

 

Steve Carter, Attorney General of Indiana, Michael T. Schaefer, David L. Steiner, Deputy Attorneys General, Indianapolis, IN, Attorneys for Appellants.

Bruce N. Munson, Muncie, IN, Attorney for Appellees Mega Net Services and American Cash.Net.

Thomas W. Farlow, Julia Blackwell Gelinas, Lucy R. Dollens, Locke Reynolds LLP, Indianapolis, IN, Attorneys for Appellee Planet Cash of Indiana, Inc.

## OPINION

BAILEY, Judge.

### Case Summary

In this consolidated appeal, Appellants–Petitioners Department of Financial Institutions ("Department") and Steve Carter, Attorney General of Indiana (collectively referred to as "Appellants") appeal the trial courts' denials of a preliminary injunction in favor of Appellees–Respondents Mega Net Services ("Mega Net"), American Cash.Net ("American Cash"), and Planet Cash (collectively, "Appellees").[1] We reverse and remand.

### Issue

Appellants raise one issue, which we restate as whether the trial courts in question abused their discretion by, first, refusing to invoke the *per se* rule applicable to preliminary injunctions, which does not require a showing of irreparable harm, because Appellees are in the business of issuing small loans—disguised as Internet rebates—and, therefore, their business operations violate Indiana Code Section 24–4.5–7–410.

### Facts and Procedural History

This appeal concerns the propriety of three business entities—i.e., Appellees—

---

**1.** The present controversy is the result of three separate actions in two different trial courts. The record reveals that Appellants filed petitions for preliminary injunction against Mega Net and American Cash in Delaware Circuit Court. These petitions were later consolidated and, on January 21, 2004, the circuit court entered judgment in favor of Mega Net and American Cash. Appellants also sought preliminary injunctions against Planet Cash and Cash Links, in separate actions, from the Allen Circuit Court, which were denied. Because Cash Links ceased its business operations, it has been dismissed from the present appeal with prejudice.

which purport to be Internet service providers, as opposed to small loan companies. Each business in question offers its consumers an immediate cash rebate in exchange for a one-year commitment to purchase Internet service at a biweekly rate between eighteen and twenty dollars. In addition, none of the businesses at issue hold a license from the Department to issue loans.

## I. Appellees and their Business Operations

### A. Mega Net

In its customary business practices, Mega Net does not give "loans" to its customers. Tr. at 64. Rather, pursuant to written contract, customers that purchase Internet service from Mega Net receive an immediate cash rebate of one hundred and twenty dollars per Internet account opened. In exchange, the customer commits to a one-year Internet contract with Mega Net and is obligated to make bi-weekly payments—or twenty-six equal installments—of twenty dollars for Internet service. If the customer terminates the contract prior to the expiration of the one-year period, he or she is obligated to pay an "early termination fee" of one hundred and twenty dollars, i.e., the amount of the rebate. Pl.'s Ex. 4.

In practice, however, if a potential Internet consumer needs one hundred dollars, Mega Net will offer him or her an immediate one-hundred-dollar cash rebate in exchange for a one-year contractual commitment. The customer is then obligated to pay twenty dollars biweekly for Internet service. Customers that pay on time may receive a five-dollar-coupon, reducing their financial obligation to fifteen dollars every two weeks.

Indeed, in a telephone conversation between the Department and an employee of Mega Net, the following interaction occurred:

[Caller:] Yeah, I'd like to get some money what do I need to do?

MN: Oh we have rebates.

\* \* \* \* \* \*

MN: Rebates, we have we offer internet access here.

\* \* \* \* \* \*

MN: It's a rebate is what it is and with that you get internet access.

[Caller:] Get internet access, I need about 200 how much would that cost me? If I qualify.

MN: It's 40.

\* \* \* \* \* \*

MN: Every two weeks.

Pl.'s Ex. 3.

At the time of the injunction hearing, Mega Net, which has been in business since December of 2002, had approximately thirty active customers, not including the "sixty-five or something" customers who had previously allowed their contracts with Mega Net to expire. Tr. at 67. All of these prior customers terminated their business relationships with Mega Net before the one-year contractual period had ended.[2]

Mega Net's customers have unlimited access to the Internet from their home computers. Those that access the Internet from the computers located on Mega Net's premises also enjoy unlimited access, so long as such access is within normal business hours. Some of Mega Net's active customers access the Internet from the computers that are available at Mega

2. The operator of Mega Net testified that, at the time of the hearing, Mega Net had been in business for "close to a year." Tr. at 68.

Net; others access the Internet from their own personal computers. Mega Net does not know whether any of its active customers are actually using the Internet.

Further, Mega Net apparently limits the number of accounts that its customers may open to three. However, for each account opened, the customer receives a one-hundred-dollar rebate and is obligated to make bi-weekly payments of twenty dollars for the one-year contractual period.

In its lobby, Mega Net displays a poster with a picture of a computer and the following language:

*UNLIMITED INTERNET ACCESS*
*LOCAL DIAL–UP FROM STORE EXCHANGE*
*FULL FEATURED WEB BASED E–MAIL*
*E–MAIL VIRUS SCAN*
*100% 56K V.90 MODEMS*
*FAST AND RELIABLE CONNECTIONS*
*PRIVACY PROTECTION*

Def.'s Ex. I (emphasis in original). Mega Net also posts a sign in its lobby, at the top of which appears the word "NOTICE," in very large print, followed by the statement:

[Mega Net] *is not a "Pay Day Loan" Company* nor are we affiliated with an [sic] "pay Day Loan" Company. We do not make loans of any kind. We simply spend our advertising dollars by giving cash rebates to our customers to try our Internet Service. .

Def.'s Ex. G (emphasis in original). Under this notification, in smaller font, is written the phrase: "Per Management." *Id.* However, on a banner affixed to the front of Mega Net's office building, which is the only signage or advertisement visible to outside passers-by,[3] appears the following words: "$ NEED QUICK CASH."[4] Pl.'s Ex. 11. On this banner, there appears to be no reference to Mega Net's Internet services.

### B. American Cash

Similar to Mega Net, since it inception in June of 2002, American Cash does not give "loans" to its customers. Rather, customers purchase Internet service from American Cash and receive an immediate cash rebate of one or two hundred dollars, depending upon their need. In exchange, the customer commits to a one-year Internet contract with American Cash and is obligated to make bi-weekly payments of eighteen dollars, in the case of a one-hundred-dollar rebate, or thirty-six dollars, in the case of a two-hundred-dollar rebate, for Internet service. In a taped telephone conversation between the Department—acting as a potential customer—and an employee of American Cash, the following discussion occurred:

AC: Ok, where [sic] you wanting $100 or $200?

[Caller:] $200

AC: Ok $200 in two weeks you'd pay back 236 or could pay a $36 payment and extend it two more weeks and then pay back the 236, you can also pay half of it down you can pay 136 and then your payments would only be 18 or 118, it's however you want to do it. You can renew as many times as you like but it doesn't bring down the principle [sic] balance.

\* \* \* \* \* \*

[Caller:] Ok, can I get more than 200?

---

**3.** After Appellants filed their petition against it, Mega Net began to display Defendant's Exhibit I, which is quoted verbatim above, in its outside window.

**4.** The banner contains additional language, in much smaller font. However, because Plaintiff's Exhibit 11 is out of focus, we cannot discern those written words.

AC: No, 200 is the max.

[Caller:] When do I have to have the whole thing paid back by?

AC: Uh, you can pay payments for a year, it just doesn't bring down the balance.

\* \* \* \* \* \*

[Caller:] So if I pay payments ever [sic] two weeks for a year then I still owe the?

AC: Uh huh

[Caller:] Oh boy

AC: Yeah so if you want to pay it right back that's good it'll only cost you $36.

Pl.'s Ex. 6.

American Cash's "Internet Access Rebate Application," however, provides the customer with the option of opening one, two, or *three* accounts for Internet service. Pl.'s Ex. 8. For each account opened, the customer must pay eighteen dollars every fourteen days. By contract, should a customer terminate its subscription to American Cash's unlimited Internet service before the one-year period, he or she must pay a termination fee "equal to 100%" of the rebate. *Id.* (capitalization omitted).

American Cash's business establishment is located in a strip mall in Muncie, Indiana. The front door to the establishment bears the name "American Ca$h.net." Pl.'s Ex. 10. In addition, while American Cash advertises money orders, money transfers, and the ability to "GET UP TO $200" on its storefront, it does not advertise its Internet services. *Id.* (emphasis in original).

Dwight Blake ("Blake"), the owner of "Dialingfordollars.net," testified that his company is the Internet service provider to American Cash, as well as several other companies that serve as intermediary Internet providers to the public. Similar to American Cash, most of these other businesses contain a reference to money—such as "cash"—in their name. Blake explained that, in his client's businesses, which cater to "a section of the public that doesn't qualify for the mainstream Internet access service," the reference to "money" helps advertise the cash rebates, which in turn, will attract potential customers to the Internet service. Tr. at 79. Blake analogized this process of advertising to that of automobile dealerships offering rebates to potential buyers. With respect to the rebate, Blake instructs his clients, such as American Cash, "not to tell anybody it's any form of a loan whatsoever. It is simply Internet access service with a cash rebate for them to come do business with us." Tr. at 81. Blake also advises his clientele to maintain a computer system at all times in its lobby for use by the customers, i.e., the end users, who do not have access to a personal computer at home.

### C. Planet Cash

Similarly, Planet Cash provides its customers with an immediate cash rebate of one hundred and twenty dollars for each Internet account opened. Upon receipt of the rebate, the customer commits to a one-year Internet contract with Planet Cash and is obligated to make bi-weekly payments—or twenty-six equal installments—of twenty dollars for Internet service. If a Planet Cash customer terminates the contract prior to the expiration of the one-year period, he or she is obligated to pay a termination fee of one hundred and twenty dollars, which is the amount of the rebate. Planet Cash does not limit the number of accounts that its customers may open.[5] However, for each account opened, the customer receives a one hundred and twenty dollar rebate and is obligated to

---

**5.** The Planet Cash contract itself provides space for five accounts.

make bi-weekly payments of twenty dollars for the one-year contractual period.

Planet Cash customers have unlimited access to the Internet from their home computers. However, those that access the Internet from the computer located on Planet Cash's premises are limited to one hour of access per two-week period, for each account opened. Indeed, by contract, a Planet Cash customer agrees that "the use of the computer at such location shall be by appointment only and that any unused time during a Period will not be carried over to subsequent Periods." Appellants' App. at 271, ¶ 3.

In a telephone conversation between a Planet Cash employee and the Department, the following discussion occurred:

[Caller:] I wanted to see about getting a loan from your store.

PC: Ok we don't do loans here what we do is offer you an instant rebate for signing up with our internet service. You can qualify for the free account today that will give you $300 in a check we keep $60 for your first two weeks of service. Then in two weeks you can either make a payment of $60 or you can come in and terminate it by bringing in the $360 all I need is your most current pay stub within the last 14 days, your most recent bank statement within the last 30 days, a blank check and a valid State ID or license.

\* \* \* \* \* \*

[Caller:] Oh, ok now I get how much money on that?

PC: You can get up to three accounts today and that would be $300.

[Caller:] I'd get $300?

PC: Um hm

[Caller:] And I'd have to pay back how much?

PC: $360

\* \* \* \* \* \*

[Caller:] And that would be in two weeks?

PC: Yes.

[Caller:] Ok, what if I couldn't pay it then.

PC: Then you could pay the $60 or you can pay $160, which would terminate one and make your payment for the other two or you can pay $260 there's a couple of options for you.

\* \* \* \* \* \*

[Caller:] Ok, alright and you said something about internet service do I actually have access for an internet?

PC: Yes, that's what you are getting the money for, signing up for an internet service.

[Caller:] Oh, well what if I don't have a computer at home.

PC: That's something you get whether you use the service or not and we also have a customer computer here that you use at anytime at no charge.

Appellants' App. at 274–75.

## II. Commencement of the Present Lawsuits

On or about November 21, 2003, pursuant to Indiana Code Section 24–4.5–7–409(5),[6] Appellants filed their amended verified complaints for preliminary and permanent injunction against Appellees—in three separate actions, two of which were later consolidated. After conducting a hearing on Appellants' claims against Mega Net and American Cash, the trial

---

**6.** Indiana Code Section 24–4.5–7–409 provides that: "The department may sue: (a) to enjoin any conduct that constitutes or will constitute a violation of this chapter; and (b) for other equitable relief."

court denied Appellants' petitions for preliminary and permanent injunction. In so doing, the trial court made the following findings and conclusions:

### FINDINGS OF FACT

 * * * * * *

6. Although the [Appellants] characterize [Appellees'] transactions as "disguised loans," there was no evidence of a specific customer of either [Mega Net] or [American Cash] being required to repay a rebate.

7. Principals of both [Mega Net] and [American Cash] testified that their businesses would be in jeopardy if they were forbidden to continue their rebate programs.

### CONCLUSIONS OF LAW

1. It is not apparent from the evidence that the transactions between [Mega Net] and [American Cash] and their respective customers amount to "disguised loans."

2. Although [Appellants] argue that they are not required to show that irreparable harm would result in the absence of a preliminary injunction because of the statutory violations of [Mega Net] and [American Cash,] the evidence does not clearly establish such statutory violations. Thus, [Appellants] must show that irreparable harm will result if a preliminary injunction does not issue.

3. [Appellants] failed to meet their burden of showing that they would suffer irreparable harm if a preliminary injunction does not issue.

4. [Appellants] have also failed to establish both a reasonable likelihood of success on the merits and that the harm [Appellants] would suffer in the absence of a preliminary injunction outweighs the harm [Appellees] would suffer under a preliminary injunction.

5. The request for preliminary injunctions against [Mega Net] and [American Cash] should be denied.

Appellants' App. at 10–11.

Likewise, after conducting a hearing against Planet Cash, the trial court denied Appellants' petition for preliminary and permanent injunction. The trial court made the following, pertinent, findings and conclusions:

### FINDINGS OF FACT

1. [Planet Cash] engages in a very unusual business transaction that, while being called a "rebate", may also appear to be a very high interest loan.

2. [Appellants] failed to prove [they] would suffer irreparable harm if the preliminary injunction does not issue.

3. [Appellants] failed to prove [they] will suffer potential harm that outweighs the potential harm to [Planet Cash] if the preliminary injunction does not issue.

### CONCLUSIONS OF LAW

 * * * * * *

4. The per se "irreparable harm" rule is inapplicable to the facts of this case. At this early stage of this litigation, [Appellants have] not shown that "it is clear that the statue [sic] has been violated." Therefore [Appellants are] not entitled to a presumption of irreparable harm to [Appellants] or that the harm to [Appellants] if injunction is not issued is greater than the harm to [Planet Cash] if the injunction is issued.

5. Based on the evidence and facts presented, [Appellants have] failed to establish it will suffer irreparable harm if a preliminary injunction does not issue.

Appellants' App. at 17–18. Following these judgments, this appeal by Appellants ensued.

## Discussion and Decision

On appeal, Appellants argue that the trial courts' denial of the preliminary injunctions at issue constituted an abuse of discretion. The grant or denial of a request for a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion. *Ind. Family & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind.2002). When determining whether to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. *Barlow v. Sipes*, 744 N.E.2d 1, 5 (Ind.Ct.App.2001) (citing Ind. Trial Rule 52(A)), *trans. denied*. When findings and conclusions are made, we must determine if the trial court's findings support the judgment. *Id.* We will reverse the trial court's judgment only when it is clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *CSX Transp., Inc. v. Rabold*, 691 N.E.2d 1275, 1277 (Ind. Ct.App.1998), *trans. denied*. We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. *Barlow*, 744 N.E.2d at 5. Moreover, "[t]he power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor." *Id.*

To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence that:

(1) [movant's] remedies at law were inadequate, thus causing irreparable harm pending resolution of the substantive action;

(2) it had at least a reasonable likelihood of success at trial by establishing a prima facie case;

(3) its threatened injury outweighed the potential harm to appellant resulting from the granting of an injunction; and

(4) the public interest would not be disserved.

*Robert's Hair Designers, Inc. v. Pearson*, 780 N.E.2d 858, 863 (Ind.Ct.App.2002) (*quoting Walgreen*, 769 N.E.2d at 161). The movant must prove each of these requirements to obtain the preliminary injunction. *Pearson*, 780 N.E.2d at 863.

In the present case, Appellants contend that the trial courts in question abused their discretion when they denied the petitions for preliminary injunction on the basis that Appellants failed to establish one of the elements necessary to obtain a preliminary injunction, i.e., irreparable harm. It is well settled that, where the action to be enjoined is unlawful, the unlawful act constitutes *per se* "irreparable harm" for purposes of the preliminary injunction analysis. *See Short On Cash.Net of New Castle, Inc. v. Dep't of Fin. Inst.*, 811 N.E.2d 819, 823 (Ind.Ct.App.2004); *Ferrell v. Dunescape Beach Club Condominiums Phase I, Inc.*, 751 N.E.2d 702, 713 (Ind.Ct.App.2001). When the *per se* rule is invoked, the trial court has determined that the defendant's actions have

violated a statute and, thus, that the public interest is so great that the injunction should issue regardless of whether the plaintiff has actually incurred irreparable harm or whether the plaintiff will suffer greater injury than the defendant. *See* BLACK's LAW DICTIONARY 1162 (7th ed. 1999) (*per se* means of, in, or by itself). Accordingly, invocation of the *per se* rule is only proper when it is clear that a statute has been violated.

Appellants maintain that the trial courts' findings that Appellees' sale of Internet service is legitimate, as opposed to a mere guise for their operation as small loan businesses, are clearly erroneous. As such, Appellants' argument continues, the trial court abused its discretion by determining that Appellees did not violate Indiana Code Section 24–4.5–7–410 and, therefore, refusing to invoke the *per se* rule applicable to preliminary injunctions. Accordingly, to determine whether the trial court abused its discretion by denying the preliminary injunctions at issue, we must first determine whether Appellees violated Indiana Code Section 24–4.5–7–410.

Another panel of this Court recently confronted the question of "whether a company's policy of extending to its customers an immediate cash 'rebate,' as well as Internet service, in exchange for a one-year commitment to make bi-weekly payments in an amount equal to five times the amount of the rebate, is tantamount to the operation of a small loan business in violation of Indiana's usury laws." *Short On Cash.Net,* 811 N.E.2d at 824 (footnote omitted). In addressing this question, the *Short On Cash* Court first established that Indiana Code Section 24–4.5–7–410 applies to a controversy where the Department has determined that a transaction is in substance a disguised loan. *Id.* at 824–25 (citing Ind.Code § 24–4.5–7–102). After

determining that Indiana Code Section 24–4.5–7–410 governs the company's business operations, the Court examined whether the "rebate" at issue was actually a disguise for a consumer loan. *Short On Cash.Net,* 811 N.E.2d at 825. Important to the *Short On Cash* Court's conclusion that the company in question was operating a small loan business, as opposed to one for Internet services, were the following relevant factors: (1) the company's business operation, which did not comport with the customary definition of the term "rebate;" (2) the fact that customers were free to open unlimited Internet accounts; (3) the company's lack of advertising of its Internet services; and (4) the price for Internet service, as compared to competitive Internet service providers. *Id.* at 825–26.

With regard to the first factor, the *Short On Cash* Court observed that the company's business practice of automatically giving a cash rebate to its customers, in exchange for a one-year commitment to purchase Internet service, did not fall within the definitional scope of the term "rebate"—which implies " '[a] return of part of a payment, serving as a discount or reduction.' " *Id.* at 825 (quoting BLACK's LAW DICTIONARY 1273 (7th ed. 1999)). This was especially true in light of the fact that customers who terminated their Internet contracts within the one-year contractual period were required to repay the rebate, plus any accrued bi-weekly installments. *Short On Cash.Net,* 811 N.E.2d at 825.

Next, and with respect to the second factor, the Court noted that the company at issue did not limit the number of Internet accounts its customers could open, but rather, simply gave the customer the cash rebate for each account opened. *Id.* The *Short On Cash* Court could not garner any "legitimate reason for a customer to purchase more than one Internet account,"

thereby obligating itself to make biweekly payments to the company for each account opened. *Id.* Third, the Court considered that, while the company in dispute purported to be an Internet service provider, it did not advertise its Internet services. *Id.*

Finally, the *Short On Cash* Court considered the fact that the company in question had "only one computer available for limited use by its customers, i.e., one hour of access per two-week period, at its business location." *Id.* Thus, approximately three-fourths or more of the company's clientele—i.e., those that did not access the Internet from home—made biweekly payments of twenty dollars for, at most, one hour of Internet use every two weeks. *Id.* This was true, the Court observed, even though other competitive Internet service providers offered Internet service to their customers at a price ranging from $9.95 to $23.90 per month. *Id.*

The business operations at issue in the present case are very similar to those addressed in *Short On Cash.* In particular, here, each Appellee gives its customers an immediate cash "rebate" in exchange for a one-year commitment to purchase Internet service at a bi-weekly rate of twenty dollars, in the cases of Mega Net and Planet Cash, and eighteen dollars, in the case of American Cash. Should the customer terminate his or her contract with Appellees prior to the expiration of the one-year period, he or she is obligated to repay the rebate, as well as any accrued bi-weekly installments.

In addition, the evidence demonstrates that Appellees do not limit their customers to one Internet account; rather, by contract, Mega Net and American Cash customers may open up to three accounts and Planet Cash customers may open as many accounts as they desire. Despite testimony that families may sometimes need more than one Internet service account, we can glean no legitimate reason for a customer to purchase more than one Internet account.[7] *See, e.g., Short On Cash.Net,* 811 N.E.2d at 825. Rather, by purchasing multiple accounts, the customer merely obligates himself or herself to make biweekly payments *on each account.*

The record further reveals that, although Appellees purport to be Internet service providers, they do not advertise their Internet services to the general public, as they do their cash rebates. Mega Net, for example, does not advertise its Internet services at all to attract outside passers-by. Instead, the only signage visible to the outside public contains the phrase: "$ NEED QUICK CASH." Pl.'s Ex. 11. In its interior lobby, outside the purview of the general public, Mega Net posts two advertisements regarding its Internet services. Similarly, American Cash's business establishment, which is located in a strip mall, advertises money orders, money transfers, and the ability to

7. At the injunction hearing, Mega Net and Planet Cash asserted that, while a family only needs one account to access the Internet, the option of opening three Internet accounts would permit a household with three family members to simultaneously access the Internet. However, if this rationale is true, why do Mega Net and Planet Cash limit the number of accounts their customers may open to three? Indeed, under that same reasoning, a family composed of four individuals may benefit from having four Internet accounts, a family of five may wish to open five accounts, and so on.

Appellees also contend that they offer the rebates to their customers merely to interest the customers in purchasing the companies' main product, i.e., access to the Internet. Under this contention, however, there would be no reason to limit the amount of the product that a customer may purchase, nor would there be a reason to offer the rebate for each account opened.

"GET UP TO $200 at American Ca$h.net," but no Internet services. Pl.'s Ex. 10. Moreover, while there is a dearth of evidence regarding Planet Cash's advertising of its Internet services, the evidence demonstrates that the company has only one computer available for limited use by its customers, i.e., one hour of access per two-week period, at its business location. Thus, Planet Cash's customers that do not access the Internet from home make bi-weekly payments of twenty dollars for, at most, one hour of Internet use every two weeks per account opened. Whereas, Plaintiff's Exhibit 7, which is part of this consolidated appeal,[8] reveals that six other competitive Internet service providers, including, NetZero, AOL, Earthlink, MSN, AT&T and SBC Yahoo, offer Internet service to their customers at a price ranging from $9.95 to $23.90 per month. Pl.'s Ex. 7.

Lastly, our review of the telephone conversations between the Department and the unsuspecting employees of Appellees demonstrate that the crux of what the companies are selling is the immediate cash "rebate," and not the Internet service. Rather, the Internet service appears to be peripheral to the transactions, as evidenced by the fact that the employees are primarily concerned with explaining the structure of the rebate process, and not the Internet service. Moreover, and with respect to American Cash and Planet Cash, the inclusion of the term "cash" or "ca$h" in their companies' name and logo, without any additional reference to the Internet service which they provide, suggests that it is the "rebate" that is the true essence of their businesses, as opposed to the Internet service. In light of this evidence, the trial courts' determinations that Appellees' sale of Internet service is legitimate and not merely a guise for their operation as small loan businesses are clearly erroneous. Thus, Appellees, which operate without a usury license, are in clear violation of Indiana Code Section 24–4.5–7–410.[9] Accordingly, the trial court erred when it refused to invoke the *per se* rule in this case and, therefore, abused its discretion by denying the preliminary in-

---

8. Plaintiff's Exhibit 7 was admitted into evidence at the hearing regarding the preliminary injunctions for Mega Net and American Cash.

9. For example, pursuant to contract, Appellees' customers only retain the monetary amount of the "rebate" (i.e., principal) if they continue the contract with Appellees for the duration of the one-year contractual period. A customer that terminates the contract early—which is *anytime* prior to making the twenty-six bi-weekly payments—however, must repay the principal, as well as any outstanding bi-weekly payments. Thus, by charging bi-weekly payments of twenty dollars for the contractual period, in exchange for the one hundred and twenty dollar principal, Mega Net receives finance charges or profits in the amount of 17% of the principal or rebate, at a minimum (i.e., should the customer terminate the contract within two weeks), and 400%, at a maximum (i.e., should the customer continue the contract through the one-year period)—i.e., $520 minus $120 equals $400 divided by 100 equals 400%—per account. Similarly, by charging bi-weekly payments of eighteen dollars, in exchange for a one-hundred-dollar principal, American Cash receives finance charges or profits in the amount of 18% of the principal or rebate, at a minimum, and 368%, at a maximum—i.e., $468 minus $100 equals $368 divided by 100 equals 368%. By charging bi-weekly payments of twenty dollars, in exchange for a one-hundred-dollar principal, Planet Cash receives finance charges or profits in the amount of 20% of the principal or rebate, at a minimum, and 420%, at a maximum—i.e., $520 minus $100 equals $420 divided by 100 equals 420%. These excessive finance charges are in violation of Indiana Code Section 24–4.5–7–201(1) (providing that "Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal").

junctions in favor of Appellees, even in the absence of a showing of irreparable harm.

For the foregoing reasons, we reverse the trial courts' denial of preliminary injunctions against Mega Net, American Cash, and Planet Cash and remand for a determination of whether injunctions should be issued, consistent with this opinion.

Reversed and remanded.

SHARPNACK, J., and DARDEN, J., concur.