Anita STULLER and American Federation of State, County and Municipal Employees, Council 62 (AFSCME), Appellants–Plaintiffs,

v.

Mitchell E. DANIELS, Jr., Governor of the State of Indiana; Peter A. Bisbecos, Director of the Division of Disability and Rehabilitation Services; and Mitchell Roob, Secretary of the Indiana Family and Social Services Administration, Appellees–Defendants.

No. 02A05–0601–CV–22.

Court of Appeals of Indiana.

July 16, 2007.

Mary Jane Lapointe, C. Abraham Murphy, McMains Lapointe, P.C., Indianapolis, IN, Attorneys for Appellants.

Steve Carter, Attorney General, Frances H. Barrow, Deputy Attorney General of Indiana, Indianapolis, IN, Attorneys for Appellees.

## OPINION

RILEY, Judge.

## STATEMENT OF THE CASE

Appellants–Plaintiffs, Anita Stuller (Stuller) and the American Federation of State, County and Municipal Employees, Council 62 (AFSCME) (collectively, the Appellants), appeal the trial court's Order denying their Motion for a Preliminary Injunction, alleging that Appellees–Defendants, Mitchell E. Daniels, Jr., Governor of the State of Indiana; Peter A. Bisbecos, director of the Division of Disability and Rehabilitation Services; and Mitchell Roob, Secretary of the Indiana Family and Social Services Administration (collectively, the FSSA), failed to follow the public bidding process as required for Public–Private Agreements, enacted in Ind.Code § 5–23–5–1.[1]

We reverse and remand with instructions.

## ISSUE

The Appellants raise two issues on interlocutory appeal, which we consolidate and restate as the following single issue: Whether the trial court abused its discretion in denying Appellants' request for preliminary injunctive relief.

The FSSA raises one issue, which we restate as follows: Whether Appellants have standing to challenge the FSSA's action.

## FACTS AND PROCEDURAL HISTORY

The Fort Wayne State Developmental Center (the Center), located in Fort Wayne, Indiana is a residential facility for developmentally disabled adults, providing structured, intensive care to the most difficult patients. Pursuant to I.C. § 12–24–1–1, the Division of Disability, Aging and Rehabilitative Services of the FSSA administratively controls and is responsible for the Center. Around December of 2005, the Center had approximately 190 residents and 1,100 employees.

In 1998, the United States sued the State of Indiana over conditions at the Center and at another Indiana facility for developmentally disabled adults, the Muscatatuck State Developmental Center (Muscatatuck). Following an investigation, the Civil Rights Division of the United States Attorney General's Office concluded that "persons residing in or confined at [the Center] were being subjected to conditions that deprived them of rights, privileges and immunities secured by the Constitution of the United States and federal statute." (Appellants' App. p. 103).

On December 29, 2000, the parties entered into a Settlement Agreement approved by the United States District Court for the Southern District of Indiana. In part, the agreement sought to ensure compliance with an Executive Order issued in September of 2000 by then governor Frank O'Bannon, "mandating state agencies to complete a comprehensive plan as soon as possible for accomplishing the goal of placing persons with mental, physical, and developmental disabilities in least restrictive settings appropriate to individuals' needs." (Appellants' App. p. 105). The State's plan was submitted together

1. Oral Arguments were held on October 27, 2006 at the St. Joseph Circuit Court courtroom in South Bend, Indiana. We thank counsel for their eloquent and thoughtful advocacy.

with the Settlement Agreement and included "specific goals and timetables relating to habilitation and behavioral programs; bodily restraints; psychiatric care; medical and health care; nursing care; nutritional management, occupational therapy, and physical therapy; record keeping; integrated settings and community placements; safe environment, incident reporting, and investigations; and staffing and staff training." (Appellants' App. p. 106). Annual inspections were conducted by the United States Department of Justice to ensure compliance with the State's comprehensive plan.

On May 10, 2005, Richard Rhoad, Chief Financial Officer of the FSSA, acting on behalf of the FSSA, declared that due to ongoing problems relative to the health, safety and welfare of the residents at the facility an emergency situation existed at the Center, and as a result, entered into a letter of agreement with Liberty Healthcare Corporation[2] (Liberty) to undertake the management and operation of the Center. This letter of agreement stated, in pertinent part:

> With the approval of the Indiana Department of Administration, [FSSA] has determined it appropriate to make an emergency procurement under [I.C. § 5–22–10–4] of management services from you firm. Because FSSA is proceeding under [I.C. § 5–22–10–4], no written contract is required [I.C. § 4–13–2–14.2(b) ]. Therefore, even though it is FSSA's intention to memorialize our long-term agreement, once fully formulated, in a contract document, [Liberty]

may legally proceed without one in the interim and will expect to receive the first monthly payment by May 23, 2005.

(Appellants' App. p. 79). Following an independent assessment of the facility's residents, the FSSA determined that most of the residents could be transitioned into community based settings, with only a small minority requiring placement in a different state facility. Accordingly, in July of 2005 the State of Indiana decided to close the Center.

On December 13, 2005, Stuller,[3] an employee at the Center, and the AFSCME, the labor union representing various employees of the Center, filed their Verified Complaint Seeking Emergency Preliminary Injunction and Permanent Injunction. In their Complaint, Appellants sought preliminary injunctive relief preventing the FSSA from transitioning the Center's operation from the State to a private contractor without first complying with the public bidding procedures promulgated in I.C. § 5–23 *et seq.*

On December 19, 2005, prior to the hearing on Appellants' verified complaint, the FSSA and Liberty entered into a formal written contract, memorializing the parties' intentions as stipulated in the letter agreement. The term of the contract was made retroactively effective from August 1, 2005 until December 31, 2007 or until ninety days after all residents have moved to an alternative setting. The contract calls for a maximum payment to Liberty of $95,000,000.00.

---

**2.** Liberty is a non-governmental, private, for-profit corporation based in Pennsylvania that provides customized medical and healthcare management to public and private sector clients.

**3.** Stuller's employment was terminated once Liberty assumed complete management and

operational control of the center. She had been employed by the Center for thirty-four years and her termination ended her status as a state employee resulting in the loss of concomitant rights and protections under the State Personnel Act, I.C. § 4–15–2–1 *et seq.*

The next day, December 20, 2005, the trial court conducted a hearing on Appellants' verified complaint. Subsequently, on December 22, 2005, the trial court denied Appellants' request for preliminary injunctive relief, finding in pertinent part:

In order to obtain a preliminary injunction the moving party must show by a preponderance of the evidence that: (1) the movants' remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) the movant has a reasonable likelihood of success at trial by establishing a prima facie case; (3) the threatened injury to the movant outweighs the potential harm to the nonmovant if an injunction is granted; and (4) the public interest would not be disserved. *Mayer v. BMR Properties, LLC*, 830 N.E.2d 971 (Ind.Ct.App.2005). An injunction may not be granted if the movant fails to prove any one of the elements.

[Appellants] have alleged that [the FSSA] failed to follow the public bidding process, as required by I.C. [§ ] 5–23–5–1 *et seq.* [The FSSA] counters that FSSA's actions in procuring the professional services of [Liberty] were authorized pursuant to I.C. [§ ] 5–22–6–1. [The FSSA] argues, in essence, that the public bidding process as required under I.C. [§ ] 5–23–5–1 was not required as I.C. [§ ] 5–23–5–1 is inapplicable.

The [c]ourt agrees with [the FSSA] and finds FSSA's actions in procuring Liberty's professional, personal services were authorized pursuant to I.C. [§ ] 5–22–6–1, which provides that:

The purchasing agency of a governmental body may purchase public services using any procedure the governmental body or the purchasing agency of the governmental body considers appropriate.

As a result, the bidding process [in] I.C. [§ ] 5–23–5–1 is inapplicable.

Further, the [Appellants] have failed to prove that [the Appellants] in this action, current worker [Stuller] and the [AFSCME] would suffer irreparable harm because [Appellants'] remedies at law were inadequate. [Appellants] failed to respond to the questions asked by the [c]ourt, specifically inquiring which of [Appellants'] remedies at law were inadequate. The damages suffered by [Appellants] in this action are monetary. Thus, the legal damages are adequate. The movants in this case have failed to prove that their remedies at law were inadequate, thus causing irreparable harm pending resolution of the substantive action.

[Appellants], then, have failed to show either a reasonable likelihood of success at trial or that [Appellants'] remedies at law are inadequate.

As such, [Appellants'] request for a preliminary injunction is DENIED in its entirety.

(Appellants' App. pp. 9–10).

The Appellants now bring this interlocutory appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standing*

We proceed by first addressing the FSSA's issue as it casts the threshold question of standing before this court. The standing requirement mandates that courts act in real cases, and eschew action when called upon to engage in abstract speculation. In other words, standing focuses generally upon the question whether the complaining party is the proper person to invoke the court's power. *State ex. rel. Indiana State Bd. of Tax Com'rs v. Indiana Chamber of Commerce, Inc.*, 712

N.E.2d 992, 996 (Ind.Ct.App.1999). The doctrine remains a significant restraint on the ability of Indiana courts to act, as it denies the courts any jurisdiction absent an actual injured party participating in the case. *Id.*

### A. *Stuller's Standing*

Under the traditional standing doctrine, only those persons who have a personal stake in the outcome of the litigation and who show that they have suffered or were in immediate danger of suffering a direct injury as a result of the complained-of conduct will be found to have standing. *See State ex. rel. Cittadine v. Indiana Dept. of Transp.*, 790 N.E.2d 978, 979 (Ind. 2003). Absent this showing, complainants may not invoke the jurisdiction of the court. *Id.*

Nevertheless, in *Cittadine*, our supreme court, instead of invoking the common standing requirements, relied on Indiana's one hundred and fifty year application of the public standing doctrine to grant standing to an appellant who sought to enforce a public right. *Id.* at 984. The public standing doctrine, which applies in cases where public rather than private rights are at issue and in cases which involve the enforcement of a public rather than a private right, continues to be a viable exception to the general standing requirement. *Id.* at 983. In this light, the *Cittadine* court recognized that "when a case involves enforcement of a public rather than a private right the plaintiff need not have a special interest in the matter nor be a public official." *Id.* at 980 (citing *Schloss v. City of Indianapolis*, 553 N.E.2d 1204, 1206 n. 3 (Ind.1990)). Specifically, the public standing doctrine eliminates the requirement that the relator have an interest in the outcome of the litigation different from that of the general

public. *Id.* (quoting *Higgins v. Hale*, 476 N.E.2d 95, 101 (Ind.1985)).

Applying these principles, our supreme court relied on *Bd. of Com'rs of Decatur Co. v. State ex rel. Hamilton*, 86 Ind. 8, 12–13 (1882):

> [W]here the question is one of public concern, and the object of the mandate is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result sought to be accomplished. In such a case it is only necessary that the relator shall be a citizen, and as such interested in the execution of the laws.

Public standing principles have not only been invoked to enforce a public right or duty, but have also been applied in cases challenging various governmental activities, statutes, or ordinances. *Id.* at 981–82.

■ Here, Stuller, a citizen, seeks to enjoin the FSSA from transitioning the Center's operation from the State to a private contractor without first complying with the public bidding procedures promulgated in I.C. § 5–23 *et seq.* In other words, Stuller is proceeding to enforce a public duty, common to and benefiting the whole community. As she has an interest in common with other citizens in the execution of the law, she is not required to establish a special individualized interest in the matter. Therefore, we find that Stuller has public standing to bring the instant litigation.

### B. *AFSCME's Standing*

Relying on our recent opinion in *Save the Valley, Inc. v. Indiana–Kentucky Elec. Corp.*, 820 N.E.2d 677 (Ind.Ct.App.2005), *reh'g granted on other grounds by* 824 N.E.2d 776, *trans. denied,* FSSA argues that the AFSCME has standing to bring an action in a representational capacity only if specific members of the group have standing in their own right. Asserting

that the members lack standing in their own right, the FSSA maintains that, as a result, the AFSCME cannot have standing either.

In *Save the Valley*, we were faced with the question of associational standing under the Administrative Orders and Procedures Act (AOPA). *Id.* at 679. In our analysis of the issue, we referenced our Supreme Court's decision in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344, 97 S.Ct. 2434, 2442, 53 L.Ed.2d 383 (1977) as standing for the proposition that

> An association has standing to sue on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Recognizing that several states adopted the *Hunt* test, we turned to the public policy reasons behind associational standing and noted three important objectives: first, allowing an association to represent its members' interests promotes judicial economy and efficiency; second, associational standing would allow members, who have standing in their own right, to pool their financial resources and legal expertise to help ensure complete and vigorous litigation of the issues; and third, associations are generally less susceptible than individuals to retaliations by officials responsible for executing the challenged policies. *Id.* at 680–81. Thus, likewise adopting the *Hunt* test, the *Save The Valley* court found that the association had standing to seek administrative review under AOPA as it satisfied *Hunt's* three-part test. *See id.* at 682. Even though *Save The Valley's* holding is within the strictures of AOPA instead of I.C. § 5–23 *et* seq.; nevertheless, we find its analysis persuasive and apply it to the case at hand.

■ Focusing on *Hunt's* first requirement, we conclude that AFSCME's members have standing to appear in their own right because they were aggrieved by the FSSA's refusal to follow the public bidding proceedings of I.C. § 5–23 *et seq.* and instead award the contract to Liberty. "Aggrieved" has been defined as another person's actions or a court's decree or judgment adversely affecting someone's personal, pecuniary, or property rights. *Id.* at 682 (quoting *Huffman v. Office of Environmental Adjudication*, 811 N.E.2d 806, 810 (Ind.2004)). The record reflects that after Liberty assumed full operational control of the Center, all employees, including AFSCME's members, ceased to be State employees. As a result, the members lost the benefits of state employment, the protections of the State Personnel Act, and any accrued rights regarding vacation and benefits. Thus, it is undeniable that AFSCME's members have a personal stake in the outcome of this litigation as it directly affects their pecuniary situation.

We find *Hunt's* two remaining elements to be satisfied as well. First, that AFSCME is an association, whose purpose is to represent the interests of the employees of the Center. It is uncontested that Liberty's management of the Center adversely impacted the Center's employees. The evidence reflects that had the FSSA submitted to the public bidding procedure pursuant to I.C. § 5–23 *et seq.*, AFSCME would have encouraged its members to participate and voice their concerns in the public forum. Thus, AFSCME's interest in FSSA's decision not to follow the provisions of I.C. § 5–23 *et seq.* was directly related to its purpose as an association. Secondly, AFSCME's requested injunctive relief does not require the participation of

its individual members. Essentially, in accordance with AFSCME's prayer of relief, only the FSSA will be enjoined and requested to take the appropriate action under the statute. Thus, as AFSCME has representative capacity pursuant to the *Hunt* test, we conclude that the association has standing to bring its claim against the FSSA.

## II. *Preliminary Injunction*

Appellants contend that the trial court clearly abused its discretion by denying their Verified Compliant seeking an emergency preliminary injunction. Specifically, they assert that they satisfied the four-prong test for granting injunctive relief, *i.e.,* (1) they are reasonably likely to succeed on the merits of the underlying claim as the FSSA violated the mandated public bidding process enacted in I.C. § 5–23 *et seq.;* (2) they suffered irreparable harm *per se;* (3) Appellants' incurred injury outweighs the FSSA's harm; and (4) the injunction served the public interest as it would increase transparency in the State's award of government contracts.

### A. *Standard of Review*

 The granting or denying of a preliminary injunction is within the discretion of the trial court, and this court's review is limited to the determination of whether or not the trial court clearly abused that discretion. *Avemco Ins. Co. v. State ex rel. McCarty,* 812 N.E.2d 108, 117 (Ind.Ct.App.2004). A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances, or if it misinterprets the law. *Aberdeen Apartments v. Cary Campbell Realty Alliance, Inc.,* 820 N.E.2d 158, 163 (Ind.Ct.App.2005), *reh'g denied, trans. denied.* When determining whether or not to grant a preliminary injunction, the trial court is required to make special findings of fact and conclusions of law. *Id.* Upon review, our task is

then to determine if the trial court's findings support the judgment. *Id.* We will only reverse the trial court's judgment if it is clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* we will consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. *Id.*

 The discretion to grant or deny a preliminary injunction is dependent upon the following factors: (1) whether the remedies at law available to the party seeking an injunction are inadequate, thus exposing that party to irreparable harm pending the resolution of the substantive action if the injunction does not issue; (2) whether granting the injunction would disserve the public interest; (3) whether the party has established a reasonable likelihood of success at trial by establishing a *prima facie* case; and (4) whether the injury to the party seeking the injunction outweighs the harm to the party who would be enjoined. *Avemco,* 812 N.E.2d at 117–18.

 The moving party has the burden of showing, by a preponderance of the evidence, that the facts and circumstances entitle him or her to injunctive relief. *Indiana Family & Social Servs Admin., Div. of Family and Children, Lake County Office v. Ace Foster Care and Pediatric Home Nursing Agency Corp.,* 823 N.E.2d 1199, 1204 (Ind.Ct.App.2005). If the plaintiff fails to prove any one or more of these requirements, the trial court's grant of a preliminary injunction constitutes an abuse of discretion. *Id.* Thus, the power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare circumstances where the law and the facts are clearly in the moving party's favor. *Aberdeen Apartments,* 820 N.E.2d at 163.

## B. *Reasonable Likelihood of Success at Trial*

 Characterizing the agreement between the FSSA and Liberty as a purchase of services, the trial court found that the FSSA was not statutorily mandated to satisfy the public bidding process pursuant to I.C. § 5–23–5–1. Instead, the trial court relied on I.C. § 5–22–6–1, authorizing the FSSA to use any procedure it deems appropriate to acquire Liberty's services. As a result, the trial court concluded that Appellants failed to show a reasonable likelihood of success at trial. It is well established that a plaintiff need only show a *prima facie* case on the merits in order to successfully make a case for a preliminary injunction. *Avemco*, 812 N.E.2d at 118. A party is not required to show entitlement to relief as a matter of law, nor to prove and plead a cause that would entitle it to relief upon the merits. *Id.*

In contesting the trial court's finding, Appellants claim that the dearth of the evidence overwhelmingly establishes that the contract at issue is a public-private agreement, subject to the requirements of I.C. § 5–23 *et seq.* Comparing the explicit terms of the contract with the phraseology used in the statute, Appellants define Liberty's services as the type of operational and managerial services customarily provided by a governmental body and therefore they fall within the ambit of the public-private agreement statutes. As a result, they maintain that implementing a public bidding procedure prior to awarding the agreement is a ministerial act devoid of any discretion on the part of the FSSA.

On the other hand, standing by the trial court's conclusion, the FSSA relies on the transitional component of the agreement and impending closure of the Center in its response to Appellants' characterization of the agreement. In essence, the FSSA maintains that "[w]hile it might be necessary technically to 'operate' or 'manage' the Center transitionally in the course of providing its services, . . ., the overall purpose of the contract is to engage Liberty's services in closing the Center and safely moving its residents to less restrictive placements." (FSSA's Br. p. 12). In this light, the FSSA, like the trial court, applies the discretionary bidding provisions stipulated in I.C. § 5–22–6 *et seq.*, Public Purchasing.

 Faced with the parties' reliance on and interpretation of two different statutes, we employ the rules of statutory construction in analyzing their respective assertions. A question of statutory interpretation is a matter of law to be determined *de novo* by this court. *Pendleton v. Aguilar*, 827 N.E.2d 614, 619 (Ind.Ct.App. 2005), *reh'g denied, trans. denied.* We are not bound by a trial court's legal interpretation of a statute and need not give it deference. *Id.* We independently review the statute's meaning and apply it to the facts before us. *Id.* During our review, the express language of the statute and the rules of statutory construction apply. *Id.* As such, we will examine the statute as a whole and avoid excessive reliance on a strict literal meaning or the selective reading of words. *Id.* We presume that our legislature intended its language to be applied logically and consistently with the underlying goals and policy of the statute. *Bambi's Roofing, Inc. v. Moriarty*, 859 N.E.2d 347, 353 (Ind.Ct.App.2006). The meaning and intention of the legislature is to be ascertained not only from the specific phraseology of a statute but also by considering design, nature and the consequences that flow from the various interpretations. *Concerned Citizens of West Boggs Lake v. West Boggs Sewer Dist., Inc.*, 810 N.E.2d 720, 723 (Ind.Ct.App.

2004). Within this analysis, we give words their common and ordinary meaning, without overemphasizing a strict literal or selective reading of individual words. *Shell Oil Co. v. Meyer*, 705 N.E.2d 962, 972 (Ind.1998), *reh'g denied.* Furthermore, statutes pertaining to the same general subject matter are *in pari materia* and should be interpreted together so as to produce a harmonious statutory scheme. *R.B. v. State*, 839 N.E.2d 1282, 1285 (Ind. Ct.App.2005).

Indiana Code section 5–22 *et seq.*, relied upon by the trial court and the FSSA, encapsulates the State's requirements for publicly purchasing services, with services defined as "the furnishing of labor, time, or effort by a person, not involving the delivery of specific supplies other than printed documents or other items that are merely incidental to the required performance." I.C. § 5–22–2–30. When purchasing services, the purchasing agency of a governmental body may use "any procedure" it "considers appropriate." I.C. § 5–22–6–1.

Conversely, Indiana Code section 5–23 *et seq.*, applied by Appellants, establishes the provisions to be followed by the State to enter into a public-private agreement with an operator. Under this article, an operator is defined as "a person who has entered either into an operating agreement or a BOT agreement with a governmental body to provide services to or on behalf of the governmental body." I.C. § 5–23–2–8. An operating agreement is specified as "an agreement between an operator and the governmental body for the operation, maintenance, repair, or management of a public facility." I.C. § 5–23–2–7. Accordingly, "a governmental body may enter into an operating agreement with an operator for the operation, maintenance, repair, management, or any combination of operation, mainte-

nance, repair or management of any public facility for any public service to be performed on behalf of the governmental body." I.C. § 5–23–4–1. Within the ambit of public-private agreements, any agreement contemplated "must require the governmental body to request proposals ... before entering into the public-private agreement." I.C. § 5–23–5–1.

In order to perform an in-depth analysis and application of the statutory language, we need to review the contractual language employed in the agreement between the FSSA and Liberty. The contract was created pursuant to the following mutual understandings:

WHEREAS, ongoing concerns about the health, safety, and welfare of residents at [the Center resulting] in the immediate need for the [FSSA] to retain personal services for the management and operation of [the Center]; and

WHEREAS, the [FSSA] determined, based on prior and existing contractual relationships with [Liberty] for personal services at other state institutions, that Liberty could immediately provide the services needed at [the Center]; and

WHEREAS, the [FSSA] entered into a letter of agreement for Liberty to take over the management and operational responsibilities at [the Center] on May 10, 2005; and

WHEREAS, the [FSSA] desires for Liberty to continue the management and operation of [the Center] which began on May 10, 2005, and to assist the [FSSA] in the process of closing the [Center] once residents are placed in appropriate community-based settings; and

WHEREAS, Liberty has demonstrated their ability to provide the needed services and is willing to continue to provide such services; and

WHEREAS, consistent with [I.C. § 5–22–6], the [FSSA] has determined that it is in the best interest of the residents of [the Center] and the State of Indiana for Liberty to provide these services.

(Appellants' App. p. 82). Some of Liberty's duties contained in the contract include:

1. [Liberty] shall be responsible for the management and operations of [the Center], and shall provide all services normally provided by a Superintendent.[4]

2. [Liberty] may provide or contract for as required to manage and operate the Center such other professional, non-professional, managerial, technical, and consulting, staff or services it deems necessary. All [Liberty] personnel policies and procedures which shall include, but are not limited to, hours of work, benefits, holidays and time off.

3. [Liberty] shall provide executives to manage and direct the Center (hereafter referred to as the "Core Management Team").

4. The Superintendent and the Core Management Team must place significant emphasis on effecting changes in the current operations pursuant to the following goals:

 a. Addressing the ongoing problems relative to the health, safety, and welfare of the Consumers[5] at the Center that led FSSA to the conclusion that an emergency exists;

 b. Ensuring that Consumers are safe from harm;

 c. Implementing effective Person Centered Planning that results in the ability of the Consumers to participate in the choice of where to live;

 d. Enabling Consumers to realize their vocational goals;

 e. Those Consumer who live at the Center until placement, live in an environment that is as restraint free as possible;

 f. Adjust, as medically appropriate, the use of psychotropic medications;

 g. Make optimal utilization of staff resources;

 h. Make optimal utilization of community resources;

 i. Make optimal utilization of the facility resources, including closing unnecessary buildings and consolidating operations into the most efficient buildings;

 j. Facilitate and assist the State in supporting the billing of per diem charges to Medicaid;

5. The Superintendent and the Core Management Team shall:

 a. Administer all applicable Federal and State requirements, including standards of participation for an intermediate care facility for people with mental retardation;

 b. Manage executive, administrative, clinical and direct care staff towards accomplishing desired/required outcomes of the Center;

 c. Manage all administrative and operational activities of the Center, including all personnel decisions;

 d. Develop/Revise Individual Program Plans;

 e. Develop/Revise Behavior Management Objectives, and implement as necessary;

---

4. The term "Superintendent" is not defined in the contract. Therefore, we will assume the term refers to the State of Indiana, as the State is administratively responsible for the Center. *See* I.C. § 12–24–1–1.

5. We can only assume "Consumers" refers to the residents of the Center, as no definitional section is included in the agreement.

f. Prepare Consumers who live at Center to choose alternative places to live and work.

6. The parties recognize that the Core Management Team administratively reports to the Director of the Division of Disability and Rehabilitative Services (the "Director"). The parties further recognize that the Director may designate the reporting relationship to a Division of Disability and Rehabilitative Services Deputy Director. The Core Management Team shall report to the Director on a regular basis the status of all pertinent activities at the Center.

\* \* \*

8. All tasks undertaken pursuant to this Agreement will be done in accordance with the administrative goals of the Director.

9. [Liberty] personnel shall attend all administrative meetings as required by the Director and/or their designee. [Liberty] shall provide management report in format and frequency as requested by the Director.

\* \* \*

13. [Liberty] shall be responsible for preparing all Consumers residing at the Center of placement into alternative community locations. . . .

(Appellants' App. p. 83–84). The State's duties include:

1. The State shall be the Owner of record and hold the license for the Center.

2. [The] State shall provide adequate resources, services, commodities, and funds so that [Liberty] can manage, staff and operate the Center in accordance with this Agreement and shall maintain all Center buildings, furniture,

fixtures and equipment in good operating condition and safe working order. (Appellants' App. p. 85).

 Based on our interpretation of both statutes and the contractual language at issue, we conclude that the agreement entered into between the FSSA and Liberty is an operating agreement, subject to the statutory requirements of public-private agreements. A review of the four corners of the contract discloses that specific references to managerial and operational services prevail and dominate throughout the agreement. Not only do the recital provisions emphasize that Liberty will undertake and be in charge of the management and operation of the Center, the particular duties of Liberty amount in essence to running the daily operation of the facility. As such, its duties range from providing for the day-to-day care in running the Center by contracting with and directing employees to address the patients' health, safety and welfare problems, utilizing the facility's buildings as it deemed fit, and facilitate the billing, to assisting the FSSA in closing the home by evaluating its residents and placing them in alternative settings.

In addition to the contractual language, the structure of the agreement equally supports our decision today. Even though the FSSA claims that it contracted with Liberty to provide a transitional phase from the Center to community-based living, we find that the agreement's provisions first and foremost provide for the continued operation of the facility. We agree with Appellants that the transitioning of the residents to alternative community placement is merely one of the operational goals ultimately aspired to under the contract. Specifically, the recital provisions first address management and operational responsibilities, with transition services only mentioned secondarily. Fur-

thermore, although the Duties of the Contractor section of the contract lists seventeen separate duties of Liberty, it is not until paragraph thirteen that Liberty is awarded the responsibility for the transitioning phase. In fact, paragraph thirteen is the only paragraph to mention these particular services.

The FSSA devotes the better part of their argument attempting to persuade this court that Liberty is providing professional services "not customarily performed by a governmental body." *See* I.C. 5–23–4–1 ("a governmental body may enter into an operating agreement with an operator for the operation, maintenance, repair, management, or any combination of operation, maintenance, repair or management of any public facility for any public service to be performed on behalf of the governmental body"). However, the record indicates that the type of transitioning services focused on by the FSSA have been provided by the State in the past. First, I.C. § 12–24–12–3 institutes guidelines for the Division of Mental Health and Addiction with respect to the monitoring of patients discharged from state institutions and the use of community residential programs. Moreover, in 1992, the State closed Central State Hospital without the assistance of any private contractors. Although the closure was a reasonable success, there was room for improvement. Thus, when the State decided to close New Castle Hospital and Muscatatuck, it hired outside vendors to close the facility to achieve better and quicker results than those experienced with Central State Hospital. While the State was assisted in the closure of both facilities, it nevertheless remained in charge of the facilities' operation through the time of closure. Regardless that the State's experience with closing residential facilities indicated that the process is better handled by outside contractors, this fact alone, does not transform the FSSA's contract with Liberty from an operating agreement to a contract purchasing professional services. It is undeniable that the statute and history indicates that Liberty's contractual duties amount to a "public service performed on behalf of the governmental body." I.C. § 5–23–4–1.

In sum, the legislature created a separate statutory scheme governing public-private agreements for the operation and management of public facilities. Characterizing the contract at issue as a purchase for services, as the FSSA encourages this court to do, merely because the transitioning phase of the contract is better performed by outside contractors would practically nullify the provisions of I.C. § 5–23. In this sense, every operating agreement may feasibly contain a phase or particular service which is better served by the unique qualifications of an outside vendor, thereby placing all contracts outside the purview of public-private agreements. Here, the contract between the FSSA and Liberty does not solely specify an advising and facilitating service whereby the contractor would expend effort on the premises at predetermined times to evaluate the work being performed. Rather, the agreement's provisions clearly contemplate Liberty's hands-on involvement in the daily care and management of the facility, with as ultimate goal the transitioning of the residents and closure of the Center.

Accordingly, based on the evidence before us, we conclude that the agreement is properly characterized as a public-private agreement, subject to the mandatory public bidding process enacted in I.C. § 5–23–5 *et seq.* Thus, we find that the trial court misapplied the law by relying on I.C. § 5–22–6–1, authorizing the FSSA to use any procedure it deems appropriate to acquire Liberty's services. *See Aberdeen Apartments,* 820 N.E.2d at 163. Therefore, we

hold that Appellants showed a reasonable likelihood of success at trial by presenting a *prima facie* case on the merits. *Avemco,* 812 N.E.2d at 118.

### C. *Irreparable Harm and Balancing of Hardships*

Next, in order to satisfy their claim for a preliminary injunction, Appellants are required to show that they suffered irreparable harm. Because the FSSA violated I.C. § 5–23 *et seq.,* Appellants maintain that they were irreparably harmed *per se* and thus do not need to establish actual harm.

It is well settled that "[w]here the action to be enjoined is unlawful, the unlawful act constitutes *per se* irreparable harm for the purposes of the preliminary injunction analysis." *Union Tp. School Corp. v. State ex rel. Joyce,* 706 N.E.2d 183, 192 (Ind.Ct.App.1998), *trans. denied* (citing *L.E. Services v. State Lottery Commission,* 646 N.E.2d 334, 349 (Ind.Ct.App. 1995), *trans. denied* ). The *per se* rule drops two prongs from the usual four-prong test used to determine whether a preliminary injunction should issue. *Id.* The elimination of two prongs eases the burden on the party seeking the injunction. Specifically, when the rule is invoked, the court has determined that the defendant's actions have violated a statute and, thus, that the public interest is so great that the injunction should issue regardless of whether the plaintiff has actually incurred irreparable harm or whether the plaintiff will suffer greater injury than the defendant. *Id.; see also Dept. of Financial Institutions v. Mega Net Services,* 833 N.E.2d 477, 485–86 (Ind.Ct.App.2005). Accordingly, invocation of the rule is only proper when it is clear that the statute has been violated. *Id.*

Nevertheless, the FSSA responds that Appellants are precluded from applying the *per se* rule as "only a governmental entity is entitled to invoke the ... doctrine because of the government's unique responsibility to protect the public interest." (FSSA's Br. p. 17). In support of its argument, the FSSA directs this court's attention to *Ind. Family and Social Svcs. Admin. v. Walgreen Co.,* 769 N.E.2d 158, 162 (Ind.2002), where our supreme court stated

> This Court has indicated that a relaxed standard may sometimes be applied for clear, uncontested unlawful conduct. But because parties are relieved of several showings usually necessary to obtain injunctive relief, this relaxed standard "is only proper when it is clear that [a] statute has been violated."

> In prior Indiana decisions employing the relaxed standard, the "per se" rule has been used to enjoin activity that is clearly unlawful and against the public interest ... The "per se" rule has never been used to permit a private party to enjoin State action based on an alleged procedural deficiency in promulgating rules. A private assertion of public interest will rarely justify enjoining State conduct when it is based only on a procedural challenge and a prima facie case.

(internal citations omitted). Based on this language, the FSSA now argues that the supreme court has instituted an exemption in the invocation of the *per se* rule based on the status of the parties. As such, they generalize that only a governmental agency or actor can employ the doctrine as these parties may not be able to show irreparable harm in the same way a private party could.

We disagree with the FSSA's reading of *Ind. Family and Social Svcs Admin.* In its analysis, the supreme court reiterated the now oft-repeated rule of irreparable harm *per se,* emphasizing the clearly unlawful character of the enjoined activity. Applied to the case at hand, the

court indicated that a mere procedural challenge—as opposed to a clear statutory violation—rarely justifies enjoinment by a private party. Applying this distinction to the case before it, the supreme court held that "[t]he rules at issue may or may not have been properly promulgated ..., but the action itself is one the statute allows." *Id.*

While we do agree with the FSSA that our supreme court made a distinction in the application of the irreparable harm *per se* doctrine, it did not differentiate based on the particular status of the parties but instead based on the particular type of violation that occurred. In essence, the supreme court distinguished a clear violation of a statute, which can be enjoined by a private party, versus a procedural challenge, which rarely justifies enjoining State conduct by a private party.

Here, as we established above, the FSSA's action before us is not one that the statute allows, *i.e.*, the FSSA committed a clear violation of public bidding procedures encapsulated in I.C. § 5–23 *et seq.* Thus, faced with the FSSA's clear violation of the statutory provisions, we conclude that the Appellants suffered irreparable harm *per se* and satisfied the balance of hardships in their favor. *See Union Tp. School Corp.*, 706 N.E.2d at 192. Therefore, we find that the trial court clearly abused its discretion. *See Avemco*, 812 N.E.2d at 117.

### D. *Public Interest*

Lastly, we review whether the grant of a preliminary injunction in this instance would serve the public interest. Whenever public moneys are encumbered by a governmental agency, a solemn duty arises to protect these moneys. *School City of Gary v. Continental Elec. Co.*, 149 Ind.App. 416, 273 N.E.2d 293, 296 (Ind.Ct. App.1971). Here, the total amount of taxpayers' funds paid to Liberty under the agreement may be as high as $95,000,000.00. Competitive bidding requirements have been legislated to safeguard the public against fraud, favoritism, graft, extravagance, improvidence and corruption, and to insure honest competition for the best work or supplies at the lowest reasonable cost. *Bigley v. MSD of Wayne Township Schools*, 823 N.E.2d 278, 282 (Ind.Ct.App.2004), *trans. denied.* Essentially, the public interest favors transparency and competition in the process for awarding government contracts.

I.C. § 5–23 *et seq.* places certain constraints on the way the government may award its public-private agreements. An abandonment of these requirements would result in a situation where the government is encouraged to grant part of its public duties to private entities without any inquiry from the public. In the instant case, while the government provided the funds, set programmatic goals and requirements, its private partner, Liberty, gained effective control over patients, which were in a relation of dependence in a social welfare program. While we do not object to the government turning to private companies in a desire to minimize costs and to enhance efficiency and flexibility, public oversight is nevertheless statutorily mandated for contracts falling within the realm of I.C. § 5–23 *et seq.*

Based on these observations, we cannot say that the public interest is disserved by the issuance of an injunction that requires only that the FSSA complies with the clear dictates of the law by submitting the agreement to a public bidding procedure to ensure public scrutiny. Thus, we conclude that the trial court's decision is against the logic and effect of the facts and circumstances. *See Aberdeen Apartments*, 820 N.E.2d at 163.

### III. Concluding Remarks and Instruction

Concluding that Appellants satisfy the four-prong test for a preliminary injunction, we reverse the trial court's decision and remand the case back to the trial court. As we reviewed a record frozen in time, we first request the trial court to conduct a status hearing and then order the trial court to establish an appropriate remedy in line with this court's holding. Accordingly, we authorize the trial court to take all necessary means to effectuate today's holding in a manner that recognizes the practical difficulties of managing an ongoing facility while at the same time ensuring the care and safety of the patients.

### CONCLUSION

Based on the foregoing, we conclude that the trial court abused its discretion in denying Appellants' request for preliminary injunctive relief.

Reversed and remanded with instructions.

BARNES, J., and CRONE, J., concur.